**BACKUS et al. v. FINKELSTEIN et al.**

District Court, D. Minnesota, Fourth Division. March 19, 1924.

**1. Corporations ⊜⟹320(1)—Stockholders' suits for recovery of assets wrongfully diverted by managing directors are maintainable.**

Stockholders' suits for recovery of assets diverted from corporation by wrongful action on part of managing directors are maintainable, where there has been mismanagement, fraudulent acts, misappropriation of corporate funds, or diversion of funds.

**2. Corporations ⊜⟹320(11)—Evidence held insufficient to sustain charge that managing directors of corporation kept false set of books.**

In stockholders' suit on behalf of corporation for recovery of assets alleged to have been diverted by wrongful action on part of managing directors, evidence *held* insufficient to sustain charge of keeping a false set of books.

**3. Corporations ⊜⟹320(11)—Evidence held to sustain charge that books kept by managing directors of corporation were inadequate.**

In stockholders' suit on behalf of corporation for recovery of assets diverted by wrongful action on part of managing directors, evidence *held* to sustain charge that books kept were inadequate.

**4. Corporations ⊜⟹318—Contracts by managing officers and directors with themselves as officers and directors of other companies may be set aside, if unfair.**

Contracts or agreements by directors and managing officers of corporation with themselves as managing officers and directors of other companies are not necessarily void, but they are viewed with the closest scrutiny, and must be open to investigation, and may be set aside, if unfair.

**5. Corporations ⊜⟹320(11)—Person, seeking to uphold contract by managing directors of corporation with themselves as officers and directors of other companies, must prove fairness.**

In case of contract or agreement by directors and managing officers of corporation with themselves as managing officers and directors

of other companies, persons seeking to uphold such contract had burden of proving that it was fair.

**6. Corporations ⬦320(11)—Evidence held to sustain charge of unfairness of contract whereby corporation was charged for films shown in other theaters owned by managing officers.**

In stockholders' suit on behalf of corporation for recovery of assets diverted by wrongful action on part of managing officers, evidence *held* to sustain charge of unfairness in contracts whereby corporation was charged for films shown in other theaters owned by such officers.

**7. Corporations ⬦320(11)—Evidence as to exorbitant charges for films by managing directors held such as to require accounting.**

In stockholders' suit on behalf of corporation for recovery of assets diverted by wrongful action on part of managing directors, evidence as to exorbitant charges for films shown at theater owned by corporation, in comparison to charges for films in other theaters owned and controlled by managing directors, *held* such as to require accounting.

**8. Corporations ⬦308(5)—Salaries of corporate officers, fixed at time they were in control of corporation, held open to investigation.**

Salaries of corporate officers, fixed by resolution at time such officers were in control of corporation, *held* open to investigation, whether or not resolutions were themselves void.

**9. Corporations ⬦308(5)—Corporate directors and officers, in fixing their salaries, must have regard for corporation's financial condition.**

Corporate directors and officers, in fixing their own salaries, must have some regard for financial condition of corporation.

**10. Corporations ⬦180—Majority stockholders, controlling corporation, must exercise good faith and diligence to protect rights of minority.**

Majority stockholders, controlling corporation, occupy fiduciary relation to minority stockholders, and are bound to exercise good faith, care, and diligence to protect rights of minority.

**11. Corporations ⬦308(5)—Salaries voted managing directors at time they controlled corporation held merely convenient method for absorbing profits.**

Salaries voted managing directors by corporation at time they were in control thereof *held* merely a convenient method for absorbing profits, instead of simply making payments for actual services performed.

**12. Corporations ⬦320(11)—Evidence showing large sums of money paid to managing directors held to require accounting, to determine repayment with interest.**

In stockholders' suit, on behalf of corporation for recovery of assets diverted by wrongful action on part of managing directors, evidence showing that large amounts of money were paid to such directors without authorization by board of directors *held* to require an accounting to determine whether such amounts,

considered as loans, were all repaid, with interest.

In Equity. Suit by H. N. Backus and others against M. L. Finkelstein and others. Interlocutory decree for accounting ordered.

See, also, 23 F.(2d) 357.

H. E. Fryberger, of Minneapolis, Minn., for plaintiffs.

Doherty, Rumble, Bunn & Butler, of St. Paul, Minn., for defendants.

BOOTH, District Judge. [1] In the memorandum attached to the order filed in this suit on September 8, 1920, it was held by this court that the suit was a stockholders' suit, brought on behalf of the corporation, the Miles Theater Company, for the recovery of assets diverted from it by wrongful action on the part of the individual defendants. It was also held that the complaint showed a sufficient compliance with equity rule 27 to enable suit to be maintained. That such suits are maintainable, where there has been mismanagement, fraudulent acts, misappropriation of corporate funds or assets, or diversion of funds, is well settled. C. J. vol. 14a, p. 155; Hawes v. Oakland, 104 U. S. 450, 26 L. Ed. 827; McMullen v. Ritchie (C. C.) 64 F. 253; Ranger v. Champion Co. (C. C.) 52 F. 611; Streight v. Junk (C. C. A.) 59 F. 321; Pencille v. Ins. Co., 74 Minn. 67, 76 N. W. 1026, 73 Am. St. Rep. 326; Tasler v. Peerless Co., 144 Minn. 150, 174 N. W. 731.

It was further held by this court that the joinder, as plaintiffs, of the parties who had been at one time stockholders in said company, but who alleged in the bill that they had parted with their stock by reason of wrongful acts and representations by the individual defendants, and further alleged that they now seek to rescind the sales of their stock, and to be restored to their status as stockholders, was proper, and that, if the facts should warrant, relief could be afforded in respect to the cause of action in behalf of the corporation, and also incidental relief to the stockholders seeking restoration of their original status. Price v. Union Land Co. (C. C. A.) 187 F. 886, was cited.

Evidence has been taken, both by deposition and in open court. Upon the trial it was stated by the court and acquiesced in by both parties that the issues involved in the alleged cause of action on behalf of the corporation would first be taken up and, if possible, disposed of, reserving for future consideration the issues in the causes of action in behalf of the plaintiffs who seek restoration of their

status as stockholders. In accordance with this understanding, the cause of action in behalf of the corporation has been submitted, and it is that cause of action that I shall consider at the present time.

In the bill of complaint a large number of charges of mismanagement and wrongdoing on the part of the individual defendants are made, among them, the keeping of an inadequate set of books; the keeping of a false set of books; the sending out of false financial statements to the stockholders; the taking of large and exorbitant salaries by the defendants, Finkelstein, Ruben, and Hamm; the charging of excessive prices to the New Garrick Theater in Minneapolis, which was operated by the Miles Theater Company, for moving picture films; the making use of the New Garrick Theater as a feeder for numerous other theaters owned, or controlled and operated, by said individual defendants; the charging up to expenses of the New Garrick Theater amounts paid for moving picture films which were never shown at said theater, but which were shown at other theaters owned or controlled and operated by said individual defendants, without adequate payment for the use thereof; the converting to their own use large sums of money by the individual defendants Ruben and Finkelstein from funds of the Miles Theater Company; the payment of individual debts of defendants Finkelstein and Ruben with funds of the Miles Company; the mortgaging of property belonging to the Miles Company for the benefit of Finkelstein and Ruben.

It will not be necessary to discuss all of these charges in detail at this time. The short facts in the history of the Miles Theater Company, as disclosed by the evidence, are as follows:

It was incorporated under the laws of South Dakota in August, 1911, and was authorized shortly thereafter to do business in the state of Minnesota; the authorized capital stock in the first instance was $250,000, which was shortly increased to $350,000. The par value of the shares was $10. In consideration for the transfer of property to the corporation, Charles H. Miles became the owner of 24,995 shares of the capital stock, and a considerable portion of these shares, as well as of the remaining shares, was sold to various parties, especially in the city of Detroit, Mich. The company operated the theater then known as the Miles Theater in 1912, 1913, and 1914. Dividends amounting to 9 per cent. were paid in 1912, 12 per cent. in 1913, and 3¼ per cent. during the first half

of 1914. It may well be doubted, however, from the evidence, whether these dividends were paid wholly from earnings.

In 1914 Finkelstein and Ruben, who were then engaged in operating theaters in Minneapolis and St. Paul, arranged with D. L. Bell that he should purchase the controlling interest in the Miles Theater Company on their behalf. Accordingly, in December, 1914, Bell purchased from Miles 17,501 shares of the stock of the company. The arrangement by which Bell should turn the stock over to Finkelstein and Ruben was modified, and the stock continued to be held by Bell until the fall of 1915. Meanwhile, in December, 1914, the old directors of the company resigned, and Bell, Ruben, Finkelstein, McCormick, and J. M. Bell were elected in their places. In November, 1915, D. L. Bell reached a settlement with Ruben and Finkelstein and resigned as director. McCormick resigned at the same time. Thereupon Sarah Blumenthall, an employee of Ruben and Finkelstein, and H. E. Billings, also an employee, were elected directors to fill their places. At the first meeting of the board of directors, after the stockholders' meeting in September, 1916, Ruben was elected president of the company, Finkelstein treasurer, and Sarah Blumenthall secretary. The same officers were continued until September, 1918, when H. J. Charles was elected a director and made secretary of the company, and these three officers have been continued in office from that time.

On September 7, 1920, defendant Hamm was elected a director, and has been continued as such since that time. By September, 1915, Finkelstein and Ruben had acquired 17,591 shares of the stock of the company; by September, 1916, 18,776 shares; by September, 1917, 19,878; by September, 1918, 28,741 shares, 18,773 of which stood in the name of the New Palace Theater Company, which was owned or controlled by Finkelstein and Ruben; by September, 1919, 34,086 shares, 34,080 of which stood in the name of the Twin City Amusement Trust Estate, which is a common-law trust, organized in October, 1918, the sole beneficiaries of which are Finkelstein, Ruben, and Hamm; by September, 1920, 34,230 shares stood in the name of said trust estate; by September, 1921, 34,630, at which figure it has remained.

As has been stated, dividends were paid in 1912, 1913 and the first half of 1914. No further dividends were paid until April, 1920, at which time a dividend of 10 per cent. was paid; in October, 1920, a dividend of 10 per cent. was paid; in January, 1921, a dividend

of 10 per cent. was paid; and in September, 1921, a dividend of 20 per cent. was paid. At the time these dividends were paid the stock holdings were such that $173,001 was paid to the Twin City Amusement Trust Estate and $1,974 was paid to other stockholders.

### The Books of Account.

The charge is made that a false set of books was kept prior to 1920. To support this charge, evidence was introduced that two books, other than those which were produced upon the trial, had been kept, namely, a perpetual balance book and a private ledger; also testimony which apparently showed that their contents differed materially from the figures shown by the books, papers, and other data produced upon the trial. The keeping of such books was denied on the part of the defendants.

[2] In view of the production of such original books as were claimed by the defendants to have been kept by the Miles Company, together with other records, papers, and data which, taken together, contained such full and complete information that a set of books could be and has in fact been made therefrom, without apparent discrepancies or omissions, and in view of the fallibility of the testimony of witnesses as to the contents of the alleged missing books, I am constrained to the conclusion that the charge of keeping a false set of books has not been sustained by substantial proof.

### Inadequacy of the Books Kept.

[3] In my judgment the evidence sustains this charge. The character of the books kept and produced upon the trial, the fact that a great deal of the information usually kept in regular books of account was contained in loose sheets or other memoranda, the fact that the defendants, either for their own private information or for the purpose of this trial, saw fit to have a complete set of books drawn up from the books, papers, loose sheets, and memoranda of the defendant company, are convincing evidence that the books actually kept by the company were in themselves inadequate, and such that the average man, unless he were a bookkeeper, would be unable to obtain either complete or accurate information as to the business of the company. As to the set of books drawn up by Temple, Webb & Co. from the original books and papers of the company, I may say, in passing, that a careful examination of them leads me to the conclusion that they were prepared with great care, and, so far as I have checked

them up with the original data, they appear to be accurate and complete, and the same may be said of the compilations made by Temple, Webb & Co. and introduced in evidence as Defendants' Exhibit 20. This is said without intending in any way to disparage the compilations prepared by Mr. Aaen and by Mr. Martinson, which were introduced on behalf of the plaintiff. These latter compilations and statements were, as the evidence shows, prepared without their authors having available all of the books, records, and data which were available to Temple, Webb & Co. Many of the discrepancies which appear between the two sets of compilations are in my judgment due to this fact.

### As to False Financial Statements.

This charge is based largely upon the three annual statements introduced in evidence as Plaintiffs' Exhibits 3, 4, and 5, purporting to be condensed balance sheets for periods ending November 22, 1915, August 28, 1916, and August 27, 1917. These statements are attacked as being knowingly false, and as having been sent out with the intent to deceive stockholders. Exhibit 5, for the year ending August 27, 1917, is the one which has been most dwelt upon. The statement is certainly open to criticism as being extremely meager, and it shows on its face that it was not gotten up by an expert bookkeeper. It is claimed that the statement is false, in that it does not show among the assets the amount of $14,000 represented by checks for $10,000, $3,000, $600, and $400, which had been drawn in favor of Finkelstein and Ruben, and which it is claimed were unauthorized withdrawals by them from the moneys of the company. While these items do not all appear in the statement as assets of the company, it is nevertheless claimed on behalf of the defendants that the amounts are reflected either in the item "Film binder reserve fund," $8,000, or in the item "Expenses advanced, $7,605.93," so far, at least, as the amounts of the above-mentioned checks were still unreturned to the company. It is, however, admitted by the expert accountant, who testified on behalf of the defendants, that better bookkeeping would have placed $9,000 of these items among the assets as bills receivable.

It is further claimed that the assets in this statement should have shown $21,400, representing "capital improvements," which had been added to the property. It must be borne in mind, however, that this financial statement, Exhibit 5, is supposed to have been made up in accordance with the system of

bookkeeping then actually in use, and not in accordance with what a scientific bookkeeping method would have required. Even experts differ as to what items are proper to go into capital account, and what into repairs and maintenance account. In this very case the expert who testified for the plaintiffs contended that the amount of $21,400 should have been included in capital account, whereas the expert for the defendants found such items to have been only approximately $12,000. But the bookkeeper at the time for the defendants, not having kept such an account in the books, naturally did not segregate such items in the annual statements, but lumped all the items under the head of "Expenditures."

It is further claimed that an item of "assets" should have appeared, amounting to approximately $5,800, for films paid for by the Miles Theater Company and charged up to the New Garrick, but which were not shown at that theater. The same observation may be made here as in reference to the preceding item, namely, that, inasmuch as no such segregated item appeared on the books, naturally enough it would not appear in the annual statement. This item, however, unlike the former, cannot be looked at merely from a bookkeeping standpoint. Whether such sum was actually paid out of the Miles Company funds and charged as expenses of the New Garrick Theater, from which the New Garrick received no benefit, is a question which must be answered on its merits, and will be considered later on. Leaving out of consideration this item, therefore, for the time being, the evidence as to the making up of Exhibit 5, when considered fairly and in the light of the system of bookkeeping then in vogue by the Miles Theater Company, is not such that I am ready to conclude that the statement was knowingly false, and made for the express purpose of deceiving the stockholders.

Moreover, a comparison of these several statements, Exhibits 3, 4, and 5, with the actual condition of the company's finances on the dates of the statements, as shown by Temple, Webb & Co., in its reconstructed set of books and in its compilation, Defendants' Exhibit 20 appears to show that the yearly statements, Exhibits 3, 4, and 5, recorded with substantial accuracy the business of the Miles Theater Company for the respective years, when it is borne in mind that the figures were made up on what is known as the "cash in and out system," and in disregard of the classification of certain expenditures as belonging to capital account, and in disregard, also, of depreciation of building and equipment. Inasmuch, however, as evidence which may be hereafter received upon issues not yet tried may throw further light upon the character of these statements, Exhibits 3, 4, and 5, and the intention of their authors in preparing them, I make no final conclusion in regard to these statements at the present time.

## Payment for Films Charged to New Garrick, but Not Shown There.

The evidence shows, and it is conceded, that many films were bought and paid for which were charged to the expenses of the New Garrick, which were not there shown, but were shown in other houses owned or controlled by Finkelstein, Ruben, and Hamm. The explanation given by the defendants is this: That film-producing companies oftentimes would sell their films only in groups, so that, in order to get one or two good films, suitable for the New Garrick, numerous other films in the group would be purchased; that this naturally left on hand many films unsuitable for the New Garrick; that some of these were used at other houses owned or controlled by Finkelstein, Ruben, and Hamm; that, for the use of the films by these other houses, payment was made in some instances, and in others, not, according as it appeared that the house could afford to pay for the film.

[4, 5] It may be that this arrangement was beneficial to all parties concerned, and it may also be that it was strictly fair and honest; but such an arrangement had in it an inherent vice. It was an arrangement by the defendants as directors and managing officers of the Miles Company with themselves as managing officers and directors of other companies. Such contracts or agreements are not necessarily void, but they are always viewed with the closest scrutiny, and must be always open to investigation, and may be set aside if unfair. The burden is upon the party seeking to uphold the contract. C. J. vol. 14a, p. 126; Corsicana Bank v. Johnson, 251 U. S. 68, 90, 40 S. Ct. 82, 64 L. Ed. 141; Marcy v. Dev. Co. (D. C.) 228 F. 150; Geddes v. Anaconda Co. (C. C. A.) 245 F. 225.

[6] Transactions of this nature took place during a period of years. The amounts paid by the Miles Company for such films amounted to upwards of $10,000. I am unable to say from the evidence adduced that these deals were free from any taint of unfairness towards the Miles Company. It does not relieve the situation to say that the defendants Finkelstein, Ruben, and Hamm, through their ability, bought the films for the Miles Company at much less than other theater companies

similarly situated could buy them. If these defendants were able to do this, it was their duty to do it, for they were directors, received a salary for their services, and were bound to use their best efforts for the interest of the Miles Company. The fact that they were able to buy advantageously, and did so, cannot excuse laxity on their part in making agreements for the use of such films as could not be shown at the New Garrick. Whether the utmost fairness was shown to the Miles Company in these transactions, whether they were entered into and carried out in the highest good faith, can only be determined by an examination of the particular transactions, and of all the surrounding facts and circumstances under which the transactions were entered into and carried out. An accounting will be necessary to determine the rights of the Miles Company in regard to these transactions.

### Exorbitant Charges for Films Shown at the New Garrick.

[7] It is claimed by the plaintiffs that the defendants Finkelstein, Ruben, and Hamm, through an organization of film distributors, in many instances controlled the prices which were paid by the Miles Company for films shown at the New Garrick, and that in other instances they made unfair agreements to pay for films at higher prices for the New Garrick than they paid for the same films for other theaters owned or controlled by them, situated in St. Paul. In my opinion, neither of these charges is sustained by the evidence. The evidence does not show that the defendants Finkelstein, Ruben, and Hamm, either separately or together, had any such interest in or authority over the film-distributing companies that they were able to fix prices to be charged to the New Garrick for the films purchased for it; nor do I think the fact that agreements were entered into by the said defendants, paying much higher prices for the same film when used at the New Garrick than when used at the corresponding theater in St. Paul, necessarily shows either bad faith or bad management on their part. That the charges for the same films in St. Paul were materially less than in Minneapolis was a fact well understood in the motion picture business, and the reasons for this difference were fully given and satisfactorily explained by the witnesses who testified, and who are intimately acquainted with local conditions. Moreover, the prices paid for films to be shown in the New Garrick in Minneapolis compared very favorably with prices for the same films in most other cities of the same class.

There remains, however, a third class of films, viz. those which were purchased by said defendants under a so-called blanket contract, by virtue of which said defendants themselves allocated the price to be paid by the New Garrick of Minneapolis, and by any other theater owned by them where the film was shown. As to these particular films, said defendants were acting as managing officers both for the Miles Company, and for any other theater owned and controlled by them at which the films were to be shown. In these cases the defendants were in effect making contracts for and with themselves, and these contracts must therefore be viewed with the closest scrutiny. If these contracts were actually made with the utmost good faith, they may stand; otherwise, an adjustment must be had in respect to them. Each of such contracts must stand upon its own merits. On account of this matter there must also be an accounting.

### Conspiracy to Oppress the Minority Stockholders.

It will not be necessary to discuss this charge at this stage of the litigation. We are now engaged upon the issue whether the defendants Finkelstein, Ruben, and Hamm should account for assets which properly belong to the corporation. The question whether said defendants also conspired to oppress the minority stockholders is one the bearing of which upon the issue now under investigation is mainly indirect, and for that reason I deem it unnecessary to discuss that question at this time.

### Excessive Salaries.

The salaries of Finkelstein and Ruben, commencing with January 18, 1915, were $100 per week each. This was at first paid by the treasurer without authority; but in May, 1915, these payments were ratified by the board of directors, which then consisted of D. L. Bell, J. M. Bell, McCormick, Ruben, and Finkelstein. This salary so fixed continued until February, 1916, at which time it was raised to $150 per week each, to commence February 28, 1916. The directors who voted in favor of this were Finkelstein, Ruben, Billings, Blumenthall, and Dyer. Billings and Blumenthall, as has already been noted, were employees of Finkelstein and Ruben. This salary has been continued at the same figure ever since. In September, 1918, the stockholders passed a resolution ratifying the act of the board of directors in

employing the defendant Hamm at $150 per week from April 29, 1918, and authorizing the directors to continue the employment at the discretion of the board. I have been unable to find in the record any action in regard to this matter, by the board of directors, prior to this resolution of the stockholders.

In September, 1920, defendant Hamm was elected a director. On September 7, at a meeting of the board of directors, the salaries of the officers were fixed at the figures theretofore paid. Directors Ruben, Finkelstein, Blumenthall, and Charles voted on this motion. Mr. Hamm was absent from the meeting. It may be open to serious question whether the resolutions fixing the salaries of these several officers were of any validity, in view of the control which Finkelstein and Ruben, and later on Hamm, had in the passage of the resolutions. Corp. Jur. 14A, pp. 143, 144; Jones v. Morrison, 31 Minn. 140, 16 N. W. 854; Davis v. Memphis Railway (C. C.) 22 F. 883.

[8-10] But, whether the resolutions were themselves void or not, salaries fixed under such circumstances are certainly open to investigation. Harrison v. Thomas (C. C. A.) 112 F. 22. During all of the period when these salaries were paid, there were numerous other officers also drawing salaries from the Miles Theater Company—a manager, an assistant manager, a bookkeeper, and a cashier. Their salaries totaled approximately $6,000 per year. It is true that evidence was introduced at the trial tending to show that the salaries to Ruben and Finkelstein, even at the high figure, were reasonable. On the other hand, there was evidence showing that at other theaters similarly located the salaries were very much smaller.

I do not undertake to say what the value of the total services which might be rendered by Finkelstein, Ruben and Hamm to moving picture theaters might be, in case the companies were of such size and the business of such magnitude as would warrant the paying of the full price for such services; but it must be borne in mind that the Miles Company, on the face of the showing made by the defendants' statements, was a struggling theater, at least up to 1920. Corporate directors and officials, in fixing their own salaries, must have some regard for the financial condition of the corporation. It must also be remembered that Finkelstein and Ruben, and later on the Twin City Amusement Trust Estate, were majority stockholders of the Miles Company, acting in concert. As such they occupied a fiduciary relation to the minority stockholders, and were bound to exercise good faith, care, and diligence to protect the rights of the minority. Jones v. Missouri Co. (C. C. A.) 144 F. 765; Stebbins v. Michigan Co. (C. C. A.) 212 F. 19; Hyams v. Calumet Co. (C. C. A.) 221 F. 529; Union Pac. Co. v. Frank (C. C. A.) 226 F. 906, 920.

[11] It may also be noted that during this time Finkelstein and Ruben and Hamm were drawing weekly salaries from a number of other theaters owned or controlled by them. In view of the condition of the Miles Theater Company, and in view of the services actually rendered by these three defendants, I have reached the conclusion that the sum of $10,000 per year from January 18, 1915, is all that ought to be allowed as their total compensation. In my opinion, the taking of these high salaries by these defendants was merely a convenient method for absorbing the profits, instead of simply making payment for actual services performed.

There must be an accounting on account of the matter of salaries. In fixing the amount of compensation allowable, I have proceeded upon the assumption that Finkelstein, Ruben, and Hamm were actually performing the services which they rendered to the Miles Theater Company in good faith, and were not guilty of any intentional wrongdoing against the corporation or the minority stockholders. If it shall hereafter appear from the evidence that this assumption is not well founded, and that said defendants were guilty of intentional wrongdoing toward the corporation as such directors, or of willful oppression of the minority stockholders, then the question will be open for determination whether any compensation whatever should be allowed said defendants. In this connection I may add that nothing in the evidence has been brought to my attention which would indicate that the defendant Hamm has been guilty of any intentional wrongdoing against the Miles Theater Company or the minority stockholders.

### Loans to Finkelstein & Ruben.

[12] The evidence shows that, commencing as early as 1917, certain amounts of money were paid to Finkelstein and Ruben from the funds of the Miles Company. About $14,000 up to August 27, 1917; $27,000 during the year ending August 26, 1918; $43,000 during the year ending August 23, 1919; $123,000 during the year ending August 30, 1920; $88,000 during the year ending September 3, 1921. During the latter years, the payments were made to the Twin City Amusement Trust Estate. It is claimed by the defendants that

these withdrawals were loans, and that they were all repaid. Assuming that they were loans, yet, inasmuch as they appear to have been in violation of the laws of South Dakota (which became part of the Miles Company's fundamental law), and furthermore were for unusually large amounts, and, so far as appears, were never authorized by the board of directors, these various transactions are subject to the closest scrutiny, for the purpose of seeing what the exact amounts were; whether they were all repaid, with interest; and, further, whether the purposes to which the moneys thus borrowed were put by the borrowers were inimical to the best interests of the corporation. An accounting is necessary on account of this matter also.

### The Bell Mortgage.

A certain mortgage of about $52,000 was on the Miles property when Bell bought the controlling interest in the stock. This mortgage had been personally assumed by Miles, and it was agreed that it should be assumed by Bell. On the transfer of the stock to Finkelstein and Ruben, it was agreed that the mortgage should be assumed by them. It is charged that this mortgage was paid afterward, in part or in whole, out of funds of the Miles Company; in my opinion, the evidence does not sustain this charge.

### Capital Trust and Savings Bank Mortgage.

In November, 1916, a mortgage for $250,000 was made by the New Palace Theater Company of Minneapolis and the New Princess Theater of St. Paul to the Capital Trust & Savings Bank. It is charged in the bill of complaint that Finkelstein and Ruben caused real and personal property belonging to the Miles Company to be included in this mortgage. The two mortgagor companies were owned or controlled by Finkelstein and Ruben. Included in the property covered by the mortgage were 18,773 shares of the Miles Company stock, which was owned by Finkelstein and Ruben. This, of course, did not amount to mortgaging the property of the Miles Company. There were, however, included in the mortgage, certain covenants by the mortgagor companies in reference to the

Miles Company, and among them the following: "To cause the Miles Theater Company to refrain from assigning, incumbering, or otherwise disposing of the leasehold, estates, and property belonging to it as aforesaid."

Whatever the legal effect of this covenant may be, yet the actions of Finkelstein and Ruben in causing the mortgagor companies which were owned or controlled by them to make this mortgage, and to include in it the Ruben and Finkelstein stock in the Miles Company, and also to enter into the covenant above quoted, were in my judgment of questionable propriety, if not a breach of trust, in view of the fact that Ruben and Finkelstein were directors of the Miles Company, and might be called upon at any time to vote upon the necessity or wisdom of the Miles Company placing a mortgage upon its own property.

I have not undertaken to discuss or pass upon all of the charges against the defendants made by the plaintiffs in their complaint. I have simply sought briefly to indicate the reasons why I have reached the conclusion that an accounting is necessary. The accounting must be general; but, while I have no inclination to limit its character, yet the taking of the same need not, and in my judgment ought not to, necessitate an analysis of all of the items of receipts and expenditures of the Miles Company while under the management of Finkelstein and Ruben, down to the present time, nor a complete construction of new books of account covering that period. Many of the matters to be investigated have already undergone more or less scrutiny. Tabulations have been made as to some of the matters involved. Whenever these tabulations, or books of account, for example, those constructed by Temple, Webb & Co., can be used to shorten the work of accounting, they should be so utilized, unless their accuracy is seriously questioned.

An interlocutory decree for an accounting in accordance with the foregoing views, and reserving the other issues in the case for future consideration, may be prepared by counsel for plaintiffs and submitted to counsel for defendants as to form before being presented for signature.