## RUBEN et al. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 11100.

Circuit Court of Appeals, Eighth Circuit.
July 14, 1938.

STONE, Circuit Judge, dissenting.

Benedict Deinard, of Minneapolis, Minn. (George B. Leonard, of Minneapolis, Minn., on the brief), for petitioners.

Joseph M. Jones, Sp. Asst. to Atty. Gen. (James W. Morris, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before STONE, SANBORN, and WOODROUGH, Circuit Judges.

WOODROUGH, Circuit Judge.

This appeal is taken by the executors of the estate of I. H. Ruben, deceased, to review a decision of the Board of Tax Appeals (36 B.T.A. 604) sustaining income taxes found to have accrued against Mr. Ruben in his life-time for the year 1929.

Mr. Ruben did not actually receive the amount of money upon which the tax is based by way of gain or profit from any of his activities or investments in that year, but a compromise settlement was effected during the year whereby a corporation in which Mr. Ruben was a stockholder paid out a large sum of money, and Mr. Ruben was released from certain heavy claims that were being made against him and others. The position of the Commissioner is that the payment so made by the corporation, resulting in the release of claims against Mr. Ruben, should be deemed a distribution to Mr. Ruben made by the corporation within the definition of a dividend under Section 115(a) Revenue Act 1928, c. 852, 45 Stat. 791, 26 U.S.C.A. § 115(a), taxable as such under Section 22 (a) Revenue Act 1928, 45 Stat. 797, 26 U.S.C.A. § 22 (a). The executors deny that there was any taxable distribution of a dividend by the corporation to Mr. Ruben within the meaning of the act.

It appears that before 1929 Ruben and his associates, Hamm and Finkelstein, had during a course of years accomplished the acquisition of 34,792 out of a total of 35,000 shares of the capital stock of a corporation called the Miles Theater Company, and had caused the shares so acquired to be transferred at first to their copartnership, and then to a common law trust owned by them, and then to the Northwest Theatres Circuit, Inc., a corporation in which they owned all the stock. The acquisition of the majority of the stock of the Miles company had been accomplished by the year 1914, and Ruben and his associates had controlled the operation of its theatre in Minneapolis since that time.

Protracted litigation with the prior owners of the stock of the Miles Theatre Company resulted in a federal District Court decree (December 24, 1927, amended February 15, 1928) holding that much of the stock had been obtained from the owners by fraud and directing that rescission should be awarded as to 13,062 shares, and that 12,654 shares should be cancelled. It was further adjudged that improper charges against the Miles corporation and improper disbursements out of its assets had been made during the control of the corporate affairs by Ruben and his associates, and that the defendants in the decree, Hamm, Finkelstein, Ruben, their common law trust and the Northwest Theatres Circuit, Inc., had become liable to the corporation and its stockholders by reason of the mismanagement, and the decree adjudged that they pay to a trustee named by the court the sum of $351,542.81 for the benefit of the aggrieved stockholders.

The money judgment against Mr. Ruben was not included in the decree on any determination that Mr. Ruben had personally received or kept that amount of money or property for himself or any considerable or proportionate part of such amount. He and the others were held accountable in that sum for breaches of fiduciary duties under the rules of equity. The opinions of the District Court indicating the grounds of decision are reported: Backus v. Finkelstein, 23 F.2d 357; Id., 23 F.2d 531, q. v. An appeal from the decree was taken to the Circuit Court of Appeals, but in April, 1929, while the appeal was pending and before it was heard, a compromise settlement was brought about by the terms of which the Northwest Theatres Circuit, Inc., paid $251,000 in full settlement of all claims against it and its co-defendants in the decree, "relating in any way to the Miles Theatre Company or any of its stock." By the terms of the settlement the Northwest Company was also discharged of its liability to restore or cancel 25,716 shares of the Miles stock, and it acquired the outstanding stock of the Miles Theatre Company which it had not previously held, amounting to 210 shares. The settlement left the Northwest Company a clear title to

all of the 35,000 shares of stock in the Miles Theatre Company.

The declaration of the common law trust had provided that the beneficiaries thereof, including Hamm, Finkelstein and Ruben, should be indemnified out of the trust estate for any personal liability, and the Northwest Company had received the assets of the trust charged with the same burden. But it is not shown that the Northwest Company was moved to make the compromise settlement to any extent because of its duty to indemnify Mr. Ruben and the others as beneficiaries of the common law trust. The decree ran against the company which had at all times assets sufficient to respond and make satisfaction. It compromised, so far as appears, in its own interest. The fact that the acts and omissions which had aggrieved the Miles company stockholders and which had led up to the decree were those of Mr. Ruben and his associates while they were making the acquisitions that went to the company did not alter its situation.

One fourth of the stock of the Northwest company was owned by Mr. Ruben and the rest by his associates, Hamm and Finkelstein. The position of the Commissioner was, and is, that Mr. Ruben had become jointly liable with his associates for their wrongs done the stockholders of the Miles Theatre Company; that the $251,000.00 payment by the Northwest Corporation was a discharge of their obligation, and that at least in the proportion of his stockholdings in the Northwest (¼ = $62,750.00) Mr. Ruben had received taxable dividend.

The Commissioner relies upon Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918; United States v. Boston & M. R. R., 279 U.S. 732, 49 S.Ct. 505, 73 L.Ed. 929; United States v. Mahoning Coal R. Co., 6 Cir., 51 F.2d 208, and other cases holding that where an item of income accrues to a taxpayer it is taxable to him, notwithstanding the fact that the same has remained in the hands of another, who pursuant to the taxpayer's contract or direction, applies it upon an obligation of the taxpayer instead of turning it directly to the taxpayer. And upon Clark v. Commissioner, 3 Cir., 84 F.2d 725; Lonsdale v. Commissioner, 8 Cir., 32 F.2d 537; Helvering v. Gordon, 8 Cir., 87 F.2d 663-666, which hold that where a corporation disburses its money at the instance of a stockholder in his interest, or to his creditor to discharge his obligation, the disbursement

may be found to be a dividend distribution to the taxpayer taxable as such.

The executors deny that the principle of such cases is applicable. They also contend that there could be no obligation upon Ruben to pay the tax involved because the $251,000 compromise payment was in discharge of the Northwest Company's own primary liability; that the liability compromised was based upon unliquidated and unadjudicated claims; that the compromise included more than settlement of the money decree and secured affirmative benefits and acquisitions to the company, and that no specific part of the compromise payment ever was, or could be, apportioned as an obligation of Ruben's.

We are satisfied that Mr. Ruben can not be held to have received taxable income in 1929 on account of the settlement made by the Northwest Company, either to the extent of one-fourth of the payment it made in its settlement with the Miles Theatre Company stockholders or to any extent. Taxation remains a practical matter, dealing with realities, Helvering v. Gordon, 8 Cir., 87 F.2d 663, and it is apparent on the facts that instead of being a harvest time of gains or profits for Mr. Ruben, the year 1929, on the showing in this case, was just the opposite. Costly and unsuccessful litigation against him and his associates, and their trust and their corporation, had extended over years, and was finally brought to compromise settlement through heavy disbursement made by the company of whose stock he was the one-fourth owner. Whatever loss to the company was included in the $251,000 payment he shared in indirectly as a stockholder. But to say that anything moved to Mr. Ruben by way of gains, profits, or income, is simply paradoxical. Rationally considered, what happened to him was that he escaped being individually subjected in his person or his separate estate to the claims and demands of the stockholders of the Miles Theatre Company. He was personally spared, but he did not get anything for himself except his release, which was the evidence of his escape. He was not enriched by having any income accrue to him or by receiving any income.

None of the cited cases holds that merely to escape from a contested money claim by the force of circumstances or the action of others, as Mr. Ruben did, makes a man subject to tax as though he had gotten an income.

In the principal case relied on by the Commissioner, it appeared that an employee

entered upon his duties under the express agreement that his income taxes would be paid by his employer. The income taxes having been levied against the employee were paid by the employer pursuant to the contract of employment and in consideration of the services rendered. Under such circumstances, it was held that the payment constituted income to the employee. Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918. In United States v. Boston & M. R. R., 279 U.S. 732, 49 S.Ct. 505, 73 L.Ed. 929, a substantially analogous situation was presented where the lessee of railroad property specifically agreed to pay taxes accruing to the government as part of the rental for the demised premises. Such payment when made was held to be income to the lessor. In the first case, an earmarked item of wages accrued to the employee taxpayer in the tax year; and in the second case, a similar item of rental accrued to the landlord taxpayer. Such facts mark the contrast to Mr. Ruben's situation. There was no such identifiable item of income accruing to Mr. Ruben in the tax year 1929. No item of wage or salary or rental or interest or capital gain or return upon investment. No gain or profit earned or unearned. Persons who were making contested claims against him ceased and desisted from making them and released him. They were induced to do so by a payment made by a corporation which had its own interest to serve, and which gained affirmative advantages through a compromise settlement. Plaintiffs in litigation simply stopped their attacks on Mr. Ruben. They got satisfaction elsewhere. Besides the lawyers no one received income out of the litigation or its compromise settlement except the persons to whom the $251,000.00 was distributed.

As we take the view that upon a practical application of the undisputed facts no income accrued to Mr. Ruben, we deem it unnecessary to discuss the several contentions ably presented in the briefs.

Reversed and remanded with directions to determine no deficiency except the conceded item of $1,836.44.

STONE, Circuit Judge (dissenting).

I am unable to concur in the able opinion written by Judge Woodrough. It seems to me necessary to set out a more detailed statement of the facts and situation here in order that the issues of law (as I see them) will more clearly appear in the proper setting.

I. H. Ruben died in 1931. The petitioners here are the executors of his estate. This is a proceeding to review a decision of the Board of Tax Appeals entered October 7, 1937, redetermining a deficiency in the income tax of Ruben for the tax year 1929.

The situation out of which this claimed tax liability arose has to do with payments made in compromise of certain litigation against Ruben and others. The facts of this situation are somewhat complicated and require statement to understand the issues of law presented here. An outline of such fact situation is as follows:

In 1914, the Miles Theater Company, a corporation (hereinafter called the Miles, owned and was operating a theater in Minneapolis. At the same time, Ruben and M. L. Finkelstein constituted the partnership of Finkelstein and Ruben (hereinafter called F. & R.) engaged in operating a circuit of motion picture theatres in Minneapolis, and St. Paul. In December, 1914, F. & R. bought a majority of the stock (17,501 shares) of the Miles and operated that theater as a unit of their circuit until April 29, 1918, during which time they had brought up their holding of stock to 22,470 shares. Upon the latter date, William Hamm bought a half interest in the F. & R. theater holdings—Finkelstein and Ruben each retaining a one-fourth interest. The new partnership continued operation until October 1, 1918, increasing its stock ownership in the Miles to 28,741 shares. On the last date above the partnership assets were transferred to a common law trust, Twin City Amusement Trust Estate (hereinafter called Twin City). In this trust the sole beneficial interests were: Theodore Hamm Brewing Company (through William Hamm, its trustee) fifty percent; Finkelstein twenty-five percent, and Ruben twenty-five percent. There were seven trustees, including Hamm, Finkelstein and Ruben. Twin City continued the operation of the former partnership property and acquired further stock in the Miles until, upon May 1, 1926, it held 34,792 shares out of a total of 35,000 shares. Upon the last date above, Twin City transferred all of its assets and business, including the Miles stock, to Northwest Theaters Circuit, Incorporated, in return for all of the capital stock of that company. This capital stock in Northwest was transferred by the trustees of Twin City as follows: to William

Hamm fifty percent, to Finkelstein and Ruben each twenty-five percent.

In January, 1920, H. N. Backus and other stockholders and former stockholders in the Miles brought an action in the United States District Court for Minnesota against Ruben, Finkelstein, Hamm, the trustees of Twin City (individually and as trustees), and the Miles. Primarily, this action was a minority stockholders suit brought on behalf of the Miles for an accounting and recovery of assets claimed to have been wrongfully diverted by defendants as controlling stockholders thereof. A subsidiary purpose of the suit, in so far as it concerned former stockholders of the Miles, was to rescind the sales of their stock. There were further interventions on the part of stockholders or former stockholders. In 1924, an interlocutory decree was entered to determine the fact and amount of claimed wrongful diversions and losses from wrongful conduct of the defendants. At that time the issue of rescission of stock sales was held in abeyance to await the result of the accounting. The accounting master reported numerous acts of wrongful or fraudulent mismanagement of the Miles and recommended definite amounts as to different items for restitution. November 19, 1927, the Court filed an opinion finally disposing of the entire case in which it approved the report of the master and in addition ordered cancellation of certain sales of stock held, at that time, by the Northwest but which had come to it through transfer from Twin City as above set forth. Backus v. Finkelstein, D. C., 23 F.2d 357. In this opinion it clearly appears that the liability found was against the three individual defendants Ruben, Finkelstein and Hamm and that Twin City was regarded as merely a holding concern for them. After determining the wrongdoing, the restitution and the cancellation of certain shares of the Miles, the court defined the machinery for carrying out its determination. Such is set forth in the opinion (pages 366, 367) as follows:

"13. There remain for consideration and determination certain questions of detail in connection with the relief which shall be granted herein:

"(a) A recovery is allowed for considerable sums of money due the corporation and for other amounts due individual plaintiffs and interveners herein. The measure of relief to be granted must be such as is proper and suited to the circumstances of the case. It will not do to make a mockery of a proceeding where many litigants have been so long and seriously contending for their rights. For obvious reasons, it may be highly improper to direct that the moneys here recovered on behalf of the corporation shall be paid into the treasury thereof. That might be paying the moneys back into the custody and control of those from whom the recovery is had. It might defeat effectually the purpose of the suit and be the beginning of another prolonged cycle of litigation. Unless conditions shall ensue which will materially change the situation, the distribution, so far as possible, should be directly to the individuals who will ultimately be entitled thereto. In cases where there is to be a direct distribution such as is proposed here, all who claim a right or interest in the funds must be given an opportunity, under proper conditions, to prove their claims.

"For the present, therefore, provision should be made as follows: (1) For the appointment of a trustee or other similar officer, who, under the direction of the court, shall receive and disburse the funds which shall be recovered in the case; (2) that, upon proper notice, all who claim a right to share in the distribution of such funds as shall be collected be required to appear and make proof of their said claims. To the extent that such claimants have a right to prove that they are within the same class as plaintiffs and interveners here, they should have the same relief.

\* \* \* \* \* \*

"(c) The appointment of a general receiver for the corporation will not be seriously considered at this time. Under all the well-considered authorities, many of which are cited above, this may be done. It is hoped, and believed that the matter here involved may be adjusted without taking that step.

"(d) The individual defendants above named are all equally liable and the defendant Twin City Amusement Trust Estate, which is a holding agency for such individual defendants, is equally bound with them. The property of the corporation and that of the individual plaintiffs and interveners, and the gains therefrom, have been commingled and confused with property of the defendants. The sums found due should therefore be a charge and lien upon the property of the defendants held by the Twin City Amusement Trust Estate.

"(e) Other relief discussed in the foregoing pages should be in accordance with the views there expressed.

"14. Jurisdiction of this suit is expressly reserved for the purpose of making such further orders therein as may be appropriate or necessary to a full and final disposition of all matters necessarily connected therewith."

In accordance with the opinion, a decree was entered on December 24, 1927. This decree appointed a trustee; adjudged recovery from the individual defendants and Twin City "and each of them"; ordered them to forthwith pay to the trustee "for the use and benefit of said company [the Miles] and all persons who may be entitled to share therein" certain sums of money aggregating $351,542.81; the cancellation of 25,716 shares of the Miles; adjudged that the converted funds belonging to the Miles had been commingled with other funds of the individual defendants and of the Twin City and allowed a lien upon the then assets of Twin City "in the amount of all sums recovered herein against defendants."

It appears that at the time the above decree was entered plaintiffs and interveners were not aware of the transfer to Northwest of the assets of Twin City (of May 1, 1926). Ascertaining this fact, Northwest was made an additional party defendant, as successor to Twin City, and the recovery was imposed as a lien on all of its assets. An appeal was perfected from this amended decree.

During the pendency of this appeal, a compromise settlement was entered into by plaintiffs and interveners upon one side and all of the defendants (including the Northwest) on the other side. This settlement took the form of a stipulation intended to be and which was the basis of a decree. The appeal having been dismissed in accordance with the stipulation, the District Court entered its decree on April 13, 1929, in accordance with the terms of the stipulation and that decree has been fully performed by all parties.

Among other things, the stipulation provided for the payment of $250,000 (to which $1,000 was subsequently added) "by defendants other than the Miles Theater Company". This payment is the basis for the present claimed tax liability—the Commissioner asserting that one-fourth of such amount ($62,750) was taxable income to Ruben for the year 1929, in which the entire amount was paid in accordance with the arrangement and decree.

Although the stipulation and resulting decree required payment by each and all of the defendants of the above sum, the entire amount was paid by the Northwest out of its own funds without the corporate minutes disclosing any corporate action with respect to the settlement of the law suit or without any declaration of dividend in relation to such payment.

The considerations moving to the defendants for the above payment were as follows: (a) a complete release of all claims against any and all of the defendants; (b) return of the stock (which had been ordered cancelled and which was then on deposit with the Court) to the defendants as their property free from all claims; (c) delivery to the defendants (as a purchase) of certificates for 210 shares of designated outstanding stock—such delivery to be free from all claims.

The declaration of trust establishing Twin City specifically provided that any trustee or beneficiary thereunder should be indemnified out of the trust estate for any personal liability. In the transfer of the assets from Twin City to Northwest it was provided that Northwest should assume all liabilities of Twin City.

In the above situation of facts the Board stated the issues and contentions before it [1]

---

[1] The statements of the Board as to the issues and contentions were as follows:

"The question in issue before the Board is whether the petitioners' decedent derived any taxable income from the payment of $251,000, in 1929 by a corporation, of which he owned one-fourth of the capital stock, in settlement of an equity decree which included not only a money judgment for $351,542.81, but also a decree for rescission and cancellation of 25,716 shares of Miles Theatre Co. stock. The decree was against the petitioners' decedent, two other individuals, a trust estate, and a corporation. The petitioners contend that their decedent derived

no taxable income from the payment made.

\* \* \* \* \* \* \*

"In this proceeding the respondent submits that the petitioners' decedent, by reason of owning one-fourth of the capital stock of Northwest, is liable for income tax upon one-fourth of the $251,000 paid by Northwest in settlement of the litigation because of the fact that the petitioners' decedent was liable for the payment of the judgment rendered against him in at least the amount of $62,750.

"Where a corporation, pursuant to a contract, pays an obligation of a third party the amount of the payment consti-

and, after setting forth the facts, discussed and determined these contentions.[2]

Under six headings petitioners present four matters as follows: (I) the payment by Northwest was made in compromise of claims never finally litigated; (II) there was not and could not be any apportionment of the part of the payment as a separate obligation of the taxpayer Ruben; (III) the liability discharged by the payment was pri-

---

tutes taxable income of the person for whose benefit the payment is made. Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918; United States v. Boston & Maine Railroad, 279 U.S. 732, 49 S.Ct. 505, 73 L. Ed. 929. Cf. United States v. Mahoning Coal Railroad Co., 6 Cir., 51 F.2d 208, certiorari denied 285 U.S. 559, 52 S.Ct. 459, 76 L.Ed. 947. The petitioners in this proceeding contend, however, that the payment made by Northwest was not pursuant to a contract; that Northwest was liable for the payment of the judgment; and that in making the payment it liquidated its own obligations."

[2] The entire opinion of the Board may be found in 36 B.T.A. 604. The portion of the opinion discussing the issues and contentions and stating the determinations of the Board are as follows:

"The whole history of the litigation resulting in the judgment against the petitioners' decedent and others was by reason of acts done principally by Hamm, Finkelstein, and Ruben. It is very evident from the portion of the opinion of the court quoted above that Twin City was made liable for the payment of money by reason of the fact that it was the 'holding agent for such individual defendants', and Northwest was joined as a party defendant because it was the successor of Twin City. We are of the opinion that there is no merit in the contention of the petitioners that Northwest was primarily liable for the payment of the money judgment. The judgment was against all of the defendants. So far as appears the plaintiffs in action might have had execution against any defendant for the entire amount of the judgment.

"We are also of the opinion that there is no merit in the contention of the petitioners that the amount of $251,000 paid in the compromise settlement was not pursuant to a contract. Hamm, Finkelstein, and Ruben were the only stockholders of Northwest. Pursuant to an agreement between them Northwest paid the money for the benefit of all parties concerned. In making the payment a liability was paid which rested against each of the stockholders, as well as against Northwest.

"In Blumenthal v. Commissioner (C.C.A. 2d Cir.) 76 F.2d 507, the court considered whether the settlor of a irrevocable trust was taxable upon income of a trust applied in discharge of her income tax. The trust estate consisted of shares of stock pledged with the bank to secure the taxpayer's bank loan. It was provided in that trust agreement that dividends received on the stock held in trust should be applied in payment of principal and interest on the bank loan. The Circuit Court [of Appeals] held that in view of the bank's custom of selling collateral stock first in event of default on a loan before enforcing payment against the debtor, the corpus of the trust was primarily bound to pay the note. When dividends on the stock were applied in payment of the note, the court held that the trust was primarily benefited, not the settlor, and that such income was not taxable to her. The decision of the Second Circuit was reversed by the United States Supreme Court in Helvering v. Blumenthal, 296 U.S. 552 [56 S.Ct. 305, 80 L.Ed. 390], upon the authority of Douglas v. Willcuts, 296 U.S. 1 [56 S. Ct. 59, 80 L.Ed. 3, 101 A.L.R. 391].

"In this proceeding the respondent has treated one-fourth of the money payment made by Northwest as a dividend to petitioners' decedent and has accordingly subjected it only to surtax. This is the most favorable view that can be taken of the payment. In any event it was a payment made by Northwest to satisfy a liability that rested against each of the stockholders. We are of the opinion that the petitioners' decedent, who owned one-fourth of the capital stock of Northwest, is liable for income tax upon at least one-fourth of the amount paid. We are of the opinion that this is the minimum amount for which he might be held liable for tax. If this amount of money had been paid over to the petitioners' decedent by Northwest, there can be no question but that it would have been a taxable distribution to the recipient. The payment by Northwest in satisfaction of a debt owing by the petitioners' decedent is the equivalent of a dividend.

"The petitioners make the further contention that, since the declaration of trust of Twin City specifically provided that any trustee or beneficiary should be indemnified out of the trust estate for any personal liability, the trust was primarily liable and the petitioners' decedent only secondarily liable so that he was entitled to exoneration from the trust estate. In Browning v. Fidelity Trust Co. (C.C.A. 3d Cir.) 250 F. 321, certiorari denied 248

marily that of Northwest; (IV) the payment by Northwest did not constitute a constructive dividend to Ruben.

### I. Finality of Claim.

Petitioners argue that the entire basis of the result reached by the Board (as stated by the Board) is that this payment was a settlement of a final adjudication of the rights of the parties in the Backus suit and, thereon, contend that there was no such finality of determination in that litigation. I am unable to see what difference this makes. This is not a finding of fact by the Board but rather either a matter of law or of mixed law and fact. It makes no difference whether the Board assigned a wrong reason if it reached a proper result, since we examine, originally, as to what was the legal status of this payment.

Whether the appeal from the decree suspended or vacated the decree and left it in that status at the time of the stipulation of settlement is not in any wise controlling here. Without doubt, there existed a bona fide contested claim which had reached the serious stage of a decree upholding the claim from which an appeal was pending. Settlement of a claim (not in itself opposed to public policy) even before suit for enforcement thereof is a valid consideration for a contract of settlement because of the benefit arising therefrom to the parties (Bofinger v. Tuyes, 120 U.S. 198, 7 S.Ct. 529, 30 L. Ed. 649; Hoyt v. Wickham, 8 Cir., 25 F.2d 777, 781, this Court; McSweeney Packing Co. v. Beshlin, 5 Cir., 211 F. 922; Graham v. Meyer, 99 N.Y. 611, 1 N.E. 143; Little v. Brown, 40 Ariz. 206, 11 P.2d 610; 12 C. J. 334; 4 C.J.S., Appeal and Error, 1107, § 624; 3 C.J. 1271) and the fact that the controversy may have reached the stage of an undetermined appeal or writ of error does not alter this situation (see citations just above). It is not material whether a claim has reached the stage of final adjudication. It is material only that the settlement results in a monetary benefit to the parties. Where a bona fide claim exists and a bona fide settlement is made thereof by a third person with the consent of the party against whom the claim is urged and such settlement results to his benefit, enough has been shown.

The opinion of Judge Cant in this case (Backus v. Finkelstein, D.C., 23 F.2d 357) was entered at a time when the only defendants before him were Ruben, Hamm and Finkelstein (both as individuals and as trustees), other trustees of Twin City (both

U.S. 564 [39 S.Ct. 9, 63 L.Ed. 423], the Circuit Court [of Appeals] considered the liability of a trustee for improperly releasing a mortgage lien on property subject to a trust mortgage. A clause in the mortgage provided that the trustee should not be answerable for any act performed by, or misconduct of, any of its agents or employees, or under any circumstances whatsoever, except for bad faith. In discussing the effect of this provision, the court stated:

" * * * The plaintiff admits that as a general proposition parties creating a trust can, by their agreement, limit the liability which is imposed by one and accepted by the other. Tuttle v. Gilmore, 36 N.J.Eq. 617, but maintains, very properly, that the law, dictated by considerations of public policy, determines the point beyond which the parties cannot agree to relieve a trustee from liability for breach of a trust duty. For instance, a trustee cannot contract for immunity from liability for acts of gross negligence or for acts done in bad faith. Such contracts are invalid because repugnant to law.

"We are of the opinion, however, that a sufficient answer to the petitioners' argument on this point is that the decree of the District Court held Hamm, Finkelstein, and Ruben each liable for the judgment debt. By virtue of the decree Ruben was personally liable for the payment of the judgment. The indemnification clause in the declaration of trust can therefore be of no avail to the petitioners in this proceeding.

"In this disposition of the case the Board does not overlook the fact that upon the settlement Northwest acquired 210 outstanding shares of Miles Theatre Co. stock. To that extent payment by Northwest was a capital expenditure which added to its assets. If the evidence afforded the basis for determining the cost of these additional shares, a reduction might be made in the amount of $62,750 determined by the respondent to have been realized by Ruben. But the determination of the respondent is prima facie correct. Welch v. Helvering, 290 U.S. 111 [54 S.Ct. 8, 78 L.Ed. 212]; Wickwire v. Reinecke, 275 U.S. 101 [48 S.Ct. 43, 72 L.Ed. 184]; Austin Co. v. Commissioner (C.C.A. 6th Cir.) 35 F.2d 910, certiorari denied [Austin Co. v. Lucas] 281 U.S. 735 [50 S.Ct. 249, 74 L.Ed. 1150]. The burden of proof was upon the petitioners to show that the determination of the respondent was incorrect. They have failed to bear such burden."

as individuals and trustees) and Twin City. Judge Cant's opinion (23 F.2d 357) clearly reveals the primary liability to be upon Ruben, Hamm and Finkelstein. He expressly regarded Twin City merely as a holding concern for and dominated by those three. It was merely for the effective carrying out of the decree and because of commingling of assets that he imposed a lien upon the assets of Twin City. All of the wrongful acts which were the entire basis of the opinion, and decree were committed before Northwest was organized by the three individual defendants and took conveyance of the assets from Twin City. Its only place in this decree was as the transferee of the commingled assets from Twin City. The relief against it was purely secondary as a means of enforcing the liability against the three individual defendants.

The payment by Northwest had in it an element of direct benefit to Northwest in that it released the lien upon its property but the cause for that lien was the primary liability of the three individuals and its payment, obviously benefited all and each of them. There can be no question that this payment was made by consent of the three individual defendants because they owned all of the stock of Northwest. Nor was this payment made by Northwest solely to protect itself. The settlement expressly provides for release of the individual defendants—who were the only ones primarily liable under the decree. Also, it cannot be lost sight of that the passage of this property from partnership to holding trust to corporation was without any change of beneficial ownership or control. I think this contention should be resolved against petitioners.

## II. Apportionment.

The claim settled was for a joint and *several* liability. The settlement released each and all from such claim. Therefore, it was a distinct monetary benefit to each of the individuals. There is a natural and a just way of apportionment of this benefit arising in this manner. That method is an allocation in accordance with the interests of the three individuals. At least, such a method is not unfair to any one of them. If the benefit is taxable at all it should not be allowed to escape taxation because of this urged difficulty of apportionment.

The only feature causing hesitation is that created by the purchase of the 210 newly acquired shares of stock in the Miles. As to the liability to pay the $351,542.81 and the retention of the stock ordered to be cancelled, the apportionment works out entire justice and relates to nothing not involved in the litigated claim. However, the 210 newly acquired shares of stock were an added consideration received by the defendants. I am not sure but that the matter of these shares might be determined either way, that is, on the one hand as being an additional benefit, or on the other hand as forming no part of the litigated claim which was settled for the benefit of the individual defendants. If it is thought that these shares should be excluded and the taxable amount reduced thereby the matter can be remanded to the Board for the purpose of ascertaining the value of those shares in the settlement and of deducting one-fourth of such value from the $62,750, regarded as a beneficial payment for Ruben. The stipulation of facts would seem to carry the basis for the ascertainment of such value where it is stipulated that "the amount to be paid each stockholder was determined by an appraisal of the value of his stock." Such an appraisal was undoubtedly necessitated and made in distribution of the amount paid to the trustee (provided for by the decree) and it could be easily ascertained what amount was apportioned to these 210 shares.

I think this point as to apportionment should be resolved against petitioners. In a dissenting opinion it serves no useful purpose to determine whether the acquisition of this stock is an additional betterment or not. The greatest effect it should, in my opinion, have in favor of petitioners is as a reduction of the taxable amount to the extent just discussed above. The important thing is that no difficulty of apportionment prevents recovery of the tax.

## III. Liability of Northwest.

Petitioners argue that the liability under the stipulated decree was primarily that of Northwest and that the payment made by it was in discharge of its own liability. The conclusion therefrom is, of course, that no taxable benefit could result to the individuals. It seems to me a clear answer to this contention is that the first decree declared a joint and several liability of the defendants. The opinion, as well as that decree, clearly reveals the *primary* liability of the three defendants. They alone, acting in partnership or through the Twin City trust, had done all of the wrongful things which resulted in any recovery. That recovery was completely allowed before the Northwest became a party to the litigation. The

Northwest was brought in only that the commingled assets transferred to it from Twin City might be made subject to a lien for the enforcement of the decree. Of course, the payment by it resulted to its benefit but, in the last analysis, that benefit was to the individual defendants both through relieving them from the liability of a claim against each of them personally and also through the release of the lien and allowance of the retention of the stock in a corporation in which they were the only stockholders.

Nor does the indemnification clause in the Twin City trust agreement and the liability assumption by Northwest on transfer of the Twin City assets change this situation. It may well be doubted whether the assets of the Twin City could be held to respond for the individual liabilities arising out of fraud and wrong-doing even had Twin City been entirely or partially divorced from the individuals. But it is unnecessary to determine that matter. Twin City was but another form of holding by the three individuals and Northwest was but a second form of such holding.

### IV. Payment as Dividend.

Petitioners strongly argue that the Board erred in regarding this payment in the nature of a constructive dividend. I do not see that it makes any difference whether this is a constructive dividend or not. Whatever its name, the basis of the tax liability is that it was a payment made for and resulting in the monetary benefit of Ruben. That it was such, I have no doubt.

Although not really related to this matter of dividend, petitioners briefly argue two matters which may be disposed of. On page 53 of the brief it is argued that to hold Ruben for this tax would result in double taxation because, the brief states, "there can be no question but that the individuals and Twin City paid an income tax on all salaries received from Miles in each of the years in which the salaries were paid." Until this statement in the brief, there was no such issue in this litigation and there is no evidence here upon which to base it now. If there were issue and evidence it might well be said that this payment prevented a repayment of salaries so secured by Ruben besides securing to him immunity from liability going far beyond the salaries and resulting in other substantial benefits such as retention of the stock in Northwest, of which he was a one-fourth shareholder.

On page 54 of the brief it is stated that if Ruben had paid his share of the settlement money directly he would have been entitled to a proportionate share of the Miles stock and that to charge him with the benefit of the payment to the extent of $62,750 without giving him the benefit of the value of the stock "which he would have been entitled to had he actually discharged the liability himself" leads to an absurd result. I am unable to follow petitioners in this argument. Whether Ruben, had he actually paid the above amount as part of the settlement, would have been entitled to one-fourth of the new stock (210 shares) might be a question, but to argue that such payment would entitle him to the delivery of one-fourth of the shares already held by a corporation, in which he had a one-fourth interest is entirely a non sequitur.

### Conclusion.

It seems to me this determination of the Board should be affirmed in its entirety. I think that, at the least, it should be remanded to the Board to ascertain the value of the 210 new shares and affirmed with a reduction of one-fourth of that value from the $62,750.