LARRY D. HUFF AND DARLENE HUFF, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 10902–77, 10903–77, 10954–77.     Filed April 26, 1983.

---

[1]Cases of the following petitioners are consolidated herewith: E. James Rohn and Judith M. Rohn, docket No. 10903–77; and John R. and Louise R. Wolfe, docket No. 10954–77.

*Herman P. Scampini, Jr.,* and *Patricia E. Cole,* for the petitioners in docket Nos. 10902–77 and 10903–77.

John R. Wolfe, pro se, in docket No. 10954–77.

*Woodford G. Rowland,* for the respondent.

CHABOT, *Judge*: Respondent determined deficiencies in Federal individual income tax against petitioners for 1973 as follows:

|  | Docket No. | Deficiency |
|---|---|---|
| Larry D. Huff and Darlene Huff | 10902–77 | $31,552 |
| E. James Rohn and Judith M. Rohn | 10903–77 | 28,430 |
| John R. and Louise R. Wolfe | 10954–77 | 22,950 |

These cases have been consolidated for trial, briefs, and opinion. The parties have settled most of the adjustments made in the notices of deficiency. The issues remaining for decision are as follows:

(1) Whether, under section 61(a),[2] the payments by Bestline Products, Inc., of civil penalties imposed on petitioner-husbands by the California Superior Court result in gross income taxable to petitioners;[3] and, if so,

(2) Whether the civil penalties are deductible by petitioners under section 162(a) or are nondeductible because of section 162(f).

## FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and

---

[2]Unless indicated otherwise, all section, chapter, and subchapter references are to sections, chapters, and subchapters of the Internal Revenue Code of 1954 in effect for the years in issue.

[3]The parties agree that any such income is not a distribution within the meaning of sec. 301 but is, instead, personal service income within the meaning of sec. 1348.

(The subsequent amendments of sec. 1348, as well as the repeal of sec. 1348 for taxable years beginning after Dec. 31, 1981, by sec. 101(c) of the Economic Recovery Tax Act of 1981 (Pub. L. 97–34, 95 Stat. 170, 183), do not affect the instant cases.)

the stipulated exhibits are incorporated herein by this reference.

When the petitions in the instant cases were filed, petitioners Larry D. Huff (hereinafter sometimes referred to as Huff) and Darlene Huff, husband and wife, resided in San Jose, Calif.; petitioner E. James Rohn (hereinafter sometimes referred to as Rohn) resided in San Jose, Calif., and petitioner Judith M. Rohn resided in Scottsdale, Ariz. (Rohn and Judith M. Rohn were husband and wife during 1973 and filed a joint return for that year); and petitioners John R. Wolfe (hereinafter sometimes referred to as Wolfe) and Louise R. Wolfe, husband and wife, resided in Walnut Creek, Calif.

### Bestline Companies

Bestline Corp. (hereinafter sometimes referred to as Corporation), at all times relevant to these cases, was a holding company. It owned and held all of the outstanding stock of Bestline Products, Inc. (hereinafter sometimes referred to as Products). Corporation and Products are hereinafter sometimes collectively referred to as the Bestline Companies. The Bestline Companies had their principal place of business in San Jose, Calif. The sole business enterprise of the Bestline Companies was the manufacture, development, and sale of detergent cleaning products through distributors located in the 50 States and to affiliated corporations in several foreign countries.

The Bestline Companies' marketing program consisted of three levels of distributors—local, direct, and general. The local distributors, the lowest level, were supposedly the retail sales force of the Bestline Companies. Individuals were encouraged to begin working at the middle level as direct distributors so they could become general distributors, the highest level. Individuals had to work as direct distributors before they could become general distributors.

From January 15, 1971, through March 1973, the Bestline Companies had three plans, whereby individuals who wanted to become general distributors paid Products certain charges and training fees. Under each of the plans, a general distributor received compensation when he sponsored a new direct distributor, or when a direct distributor he had sponsored in turn sponsored a new direct distributor. All of the plans were

endless chain schemes and were illegal under California's penal laws. An "endless chain" is defined under California law as "any scheme for the diposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for introducing one or more additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant introduces a new participant." Cal. Penal Code sec. 327 (West Cum. Supp. 1968).

The corporate management structure of Products consisted of the following employees:[4] a president; about 25 vice presidents (including executive vice presidents, 6 divisional vice presidents, and a number of assistant vice presidents); about 30 regional directors; and a number of area coordinators.

Products conducted operations in all 50 States. For purposes of managing its operations, Products divided the United States into six or seven geographical divisions and further divided each division into regions. Generally, a region consisted of one or two States. California, however, contained four regions.

The top manager of each region was the regional director. The regional director was responsible for communicating corporate policy, dealing with corporate policy in the field, training distributors in both product and distribution operations, and dealing with consumer complaints.

Huff first became associated with the Bestline Companies in 1968 as a part-time distributor. In 1969, he became a fulltime distributor[5] In 1970, Huff became an employee of Products as a regional director in Michigan. Sometime in 1970 or 1971, Huff became the assistant to the vice president of marketing at the home office, located in San Jose, Calif. and later, the assistant to the vice president of sales at the home office. Finally, sometime in 1971, Huff became the vice president of sales. As vice president of sales, Huff trained distributors and set up training programs for product knowledge and sales, including the drafting of recruitment scripts to be used by distributors, and enforced corporate policies. In 1972, Huff also

---

[4]Distributors apparently were not considered employees of the Bestline Companies.

[5]The record does not indicate which level distributor Huff worked as—i.e., general, direct, or local distributor.

became a member of Products' board of directors. Sometime in 1973, Huff stopped working for Products.

Rohn first became employed by Products in 1968 as the assistant to a vice president. Before then, Rohn delivered a seminar called "Adventures in Achievement" to Products' distributors but was not an employee of Products. In 1971, he became a vice president of Products. As the assistant to a vice president and as a vice president, Rohn's sole duty was delivering the seminar which explained techniques of recruiting and goal-setting to Products' then-current distributors.

Wolfe first became associated with the Bestline Companies in 1969 as a distributor; he later became a general distributor and then an area coordinator. In 1971, he became regional director for northern California, and held that position until September 1973. As regional director, he was responsible for recruitment meetings in the region and the managing of five area coordinators.

## California Actions and Judgments

Sometime before January 14, 1971, the attorney general for the State of California filed a civil action (hereinafter sometimes referred to as the first action) against the Bestline Companies and William E. Bailey[6] and Robert Depew (hereinafter sometimes referred to as Bailey and Depew, respectively), acting individually and in their capacities as officers and directors of the Bestline Companies, in the Superior Court of California for the county of Loss Angeles (hereinafter sometimes referred to as the California court).

On January 14, 1971, the California court entered a final judgment in the first action pursuant to a stipulation between the parties. The final judgment enjoined and restricted the type of multilevel distributors' organization the Bestline Companies could operate and it enjoined all defendants in the first action from making false or misleading representations about the amount of earnings which could be made through the marketing program, and about the ease of recruiting new distributors and selling products to consumers.

---

[6]Bailey was the founder and organizer of the Bestline Companies. Until August 1973, he was the chairman of the boards of directors and controlled the Bestline Companies; also he owned a substantial portion of Corporation.

The final judgment also required the defendants in the first action to inform all current and prospective participants, salesmen, or other persons engaged in the sale of the Bestline Companies' products orally and in writing of the terms of the final judgment. This final judgment stated that it was applicable to—

all persons, corporations or other entities acting under, by, through or on behalf of the corporate and individual defendants and to all other persons acting in concert or participating with any other defendants having actual or constructive notice of this final judgment * * *

Subsequently, the attorney general filed another action (hereinafter sometimes referred to as the second action) in the California court against the Bestline Companies, Bailey, Depew, petitioner-husbands, and numerous other individuals. After a trial which ended on June 15, 1973, the California court issued its findings of fact and conclusions of law in the second action (hereinafter sometimes referred to as the findings). The California court concluded that the Bestline Companies and 14 individual defendants, including all 3 petitioner-husbands, had willfully violated the final judgment in the first action and, in three separate respects, had violated California Business and Professions Code section 17500.[7] Although the findings in the second action included a conclusion of law that each of the defendants "contrived, prepared, set up, proposed and operated a scheme [which] violated Penal Code section 327 in that it constitutes an endless chain, as defined in that section," petitioner-husbands were neither

---

[7]Cal. Bus. & Prof. Code sec. 17500 (West 1964) (in effect for the years in issue) provides that:

"It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly * * * to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this State, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, any statement, concerning * * * services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance * * * thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any such person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell such * * * services, professional or otherwise, so advertised at the price stated therein, or as so advertised."

tried for, nor found guilty of, violating any criminal statute in this action.

In the second action, the California court found as follows:

20. * * * Each defendant had full knowledge of the terms of the judgment [in the first action] and willfully violated the terms of said Judgment. The provisions of the judgment were applicable to Bestline Products, Inc., Bestline Corporation, William E. Bailey, Robert W. DePew, as well as to all other persons acting in concert or participating with them having actual or constructive notice of the Final Judgment. Each of the other defendants acted in concert with and participated with Bestline Products, Inc., Bestline Corporation, William E. Bailey and Robert W. DePew and each defendant had actual or constructive notice of each of the terms of said judgment.

\* \* \* \* \* \* \*

23. Between January 15, 1971 and November 30, 1972, and until sometime thereafter, defendants Bestline Products, Inc., Bestline Corporation, William E. Bailey, David L. Eastis, Charles Simmons, Larry D. Huff, James Rohn, David Soto and Jerry Weiss, between March 18, 1971 and November 30, 1972, and until sometime thereafter Marvin Sternberg, between July, 1971 and November 30, 1972, and until sometime thereafter William M. Cohen and John R. Wolfe with intent to induce members of the public to purchase large quantities of product, each did disseminate or cause to be disseminated to tens of thousands of members of the California public the following fraudulent, false and misleading statements:

\* \* \* \* \* \* \*

24. Between January 15, 1971 and November 30, 1972, and until sometime thereafter, defendants Bestline Products, Inc., Bestline Corporation, William E. Bailey, David L. Eastis, Charles Simmons, Larry D. Huff, James Rohn, David Soto and Jerry Weiss, between March 18, 1971 and November 30, 1972, and until sometime thereafter Marvin Sternberg, between July, 1971 and November 30, 1972, and until sometime thereafter William M. Cohen and John R. Wolfe each did disseminate or cause to be disseminated to tens of thousands of members of the California public the statements set forth in paragraph 23 herein and had a duty to disclose and fraudulently failed to disclose to said members of the public the following:

\* \* \* \* \* \* \*

29. Defendants knew that some of the statements set forth in paragraphs 23 and 24 herein were fraudulent, false and misleading and knew or in the exercise of reasonable care should have known that each statement set forth in paragraphs 23 and 24 herein were fraudulent, false and misleading.

A modified judgment in the second action, dated December 21, 1973, permanently enjoined defendants from certain specified activities, ordered the Bestline Companies and Bailey to offer to make restitution to all persons who became direct distributors (or candidate direct distributors) after January 14,

1971, and imposed civil penalties under section 17536 of the California Business and Professions Code[8] in the amounts of (1) $1 million against Corporation and Products "jointly and severally," (2) $250,000 against Bailey "severally," (3) $100,000 against David L. Eastis (hereinafter sometimes referred to as Eastis)[9] "severally," and (4) 42,500 against another individual defendant "severally." In addition, the modified judgment ordered as follows:

19. Plaintiff shall have judgments against defendants Charles Simmons, Robert W. DePew, Larry D. Huff, James Rohn, Jerry Weiss, David Soto, Bub St. Peter, Ford K. Winnek, Marvin Sternberg, William M. Cohen and John R. Wolfe, who each shall severally pay to the State of California fifty thousand dollars ($50,000) as civil penalties pursuant to section 17536 of the Business and Professions Code.

\*     \*     \*     \*     \*     \*     \*

21. Defendants Bestline Corporation, Bestline Products, Inc., William E. Bailey, David L. Eastis, Charles Simmons, Robert W. DePew, Larry D. Huff, James Rohn, Jerry Weiss, David Soto, Bub St. Peter, Ford K. Winnek, Marvin Sternberg, William M. Cohen and John R. Wolfe *jointly and severally* shall pay to the State of California its costs of suit. [Emphasis supplied.]

On appeal by Huff, Rohn, and some of the other defendants in the second action, the modified judgment in the second action was affirmed. *People v. Bestline Products, Inc.*, 61 Cal. App. 3d 879, 132 Cal. Rptr. 767 (2d Dist. Ct. App. 1976). See also *Piambino v. Bailey*, 610 F.2d 1306, 1313–1314 (5th Cir. 1980).

All the activities of petitioner-husbands for which the civil penalties were imposed against them in the second action were done in the ordinary course and scope of their employment with Products.

---

[8]Cal. Bus. & Prof. Code sec. 17536 (West. Supp. 1972) provides generally that:

"Any person who violates any provision of this chapter [including Cal. Bus. & Prof. Code sec. 17500] shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General \* \* \* "

The number of violations of Cal. Bus. & Prof. Code for which civil penalties may be imposed is determined by the number of persons to whom misrepresentations are made. *People v. Superior Court of Los Angeles*, 9 Cal. 3d. 283, 507 P.2d 1400 (1973).

[9]Eastis was Products' president, as well as a member of its board of directors, from January 1971 through August 1973.

## *Payment of Petitioner-Husbands' Civil Penalties*

Before 1971, the Bestline Companies had a general, unwritten, national corporate policy of providing legal assistance to any of its distributors, employees, directors, or stockholders for any legal problems connected with necessary actions taken in the course of the Bestline Companies' business. At some time, each of the petitioner-husbands was told of this policy.

On June 28, 1971, after the second action had been initiated, Products' board of directors held a special meeting. The directors who attended were Depew, Eastis, and L. Diel. Depew and Eastis were among those named as individual defendants in the second action. Acting as the board of directors, these three directors voted to have Products pay its officers' and employees' attorneys' fees in the second action.

On May 31, 1973, before the date of the modified judgment in the second action, Products' board of directors held another special meeting. The directors who attended were Bailey, Eastis, Charles W. Simmons, Huff (all of whom were named as individual defendants in the second action), and Toro Ikeda. These directors adopted the following resolution:

RESOLVED: In accordance with §830(f) of the California Corporations Code, the Board of Directors deem it to be in the best interest of this corporation and its shareholders to adopt a policy pursuant to which this corporation will reimburse and indemnify any officer, abstaining director, or employee of this corporation against any damages, judgments or other monetary amounts asserted against said individuals in any action by a third party which is based upon any act or action of any such individual alleged to have been committed by such officer, director or employee. Such payment shall be made only if this Board determines that any such individual was acting in good faith within what he reasonably believed to be the scope of his employment and for a purpose which he reasonably believed to be in the best interest of the corporation and its shareholders.

RESOLVED FURTHER: That the Board of Directors hereby determine that the officers, abstaining directors, and employees (former or present) of this corporation who were named as individual defendants in the present action between the Attorney General of the State of California and the corporation (No. C2842) presently being conducted in the City and County of Los Angeles, were and reasonably believed themselves to be acting within the scope of their activities as employees, officers and directors of this corporation.

RESOLVED FURTHER: That the officers of this corporation are hereby authorized to make any such reimbursement and to perform any further acts as may be necessary to carry out the resolutions adopted above.

The $50,000 civil penalties imposed severally on Huff, Rohn, and Wolfe were paid by Products during 1973.

Products paid petitioner-husbands' civil penalties to encourage them to devote their time and energies toward their duties as employees and as an inducement to cooperate fully with Products in defending the second action, in which Products was named as a corporate defendant.

OPINION

### I. Income

Petitioners present alternative arguments as to why the payment by Products of the civil penalties imposed on petitioner-husbands does not result in gross income taxable to them. Firstly, they assert that the appropriate test for determining when a payment by another on behalf of a taxpayer results in gross income taxable to that taxpayer is whether that taxpayer receives a direct rather than incidental benefit. Petitioners maintain that the payment of the civil penalties by Products conferred only an incidental benefit on petitioner-husbands because the penalties were imposed for actions performed in the ordinary course and scope of their employment and were interwoven with the actions of the Bestline Companies.

Secondly, they assert that the Bestline Companies were legally obligated to pay petitioner-husbands' civil penalties and thus the payment extinguished a legal obligation of Products, rather than the personal liabilities of petitioner-husbands.

Thirdly, petitioners argue that including the payment in their gross income would frustrate California's public policy of requiring corporations to indemnify their officers, directors, and employees for acts done in the course and scope of their employment.

Respondent maintains that the proper test for determining whether the payment results in gross income taxable to the petitioners is whether the payment is for a personal liability or expense and thus confers an economic benefit on them. Respondent asserts that the civil penalties were either a personal liability or personal expense and that the petitioners realized gross income when Bestline Products, Inc., paid these penalties.

We agree with respondent that petitioners realized gross income from the payments of these penalties.

Gross income is defined broadly to include "all income from whatever source derived." (Sec. 61(a).) As the Supreme Court has stated, "this language was used by Congress to exert in this field 'the full measure of its taxing power.' *Helvering v. Clifford*, 309 U.S. 331, 334; *Helvering v. Midland Mutual Life Ins. Co.*, 300 U.S. 216, 223; *Douglas v. Willcuts*, 296 U.S. 1, 9; *Irwin v. Gavit*, 268 U.S. 161, 166." *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 429 (1955). Further, the Supreme Court "has given a liberal construction to this broad phraseology in recognition of the intention of Congress to tax all gains except those specifically exempted." *Commissioner v. Glenshaw Glass Co.*, *supra* at 430.

Generally, payments by another on behalf of the taxpayer constitute the realization by the taxpayer of gross income of one sort or another—e.g., a payment by an employer of an employee's taxes treated as compensation income of the employee (*Old Colony Tr. Co. v. Commissioner*, 279 U.S. 716, 729–730 (1929)); a payment by a customer on behalf of a supplier treated as business income of the supplier (*Safe Harbor Water Power Corp. v. United States*, 157 Ct. Cl. 912, 921, 303 F.2d 928 (1962)); and a payment by a corporation on behalf of a shareholder treated as dividend income to the shareholder (*Tennessee Securities, Inc. v. Commissioner*, 674 F.2d 570 (6th Cir. 1982), affg. a Memorandum Opinion of this Court;[10] *Sachs v. Commissioner*, 32 T.C. 815 (1959), affd. 277 F.2d 879 (8th Cir. 1960)).

In the instant cases, Products—petitioner-husbands' employer—paid the $50,000 civil penalty imposed severally on each petitioner-husband. Each of these payments conferred an economic benefit on the respective petitioner-husband by relieving him of his $50,000 liability.

We think it significant that Congress has provided several statutory exclusions from income for certain payments by another on behalf of a taxpayer—e.g., section 119 (meals or lodging furnished for the convenience of the employer); section 106 (contributions by employer to accident and health plans);

---

[10]T.C. Memo 1978–434.

section 110 (income taxes paid by lessee corporation); section 127 (payments by employer for educational assistance to employees). Petitioners do not argue that any of the statutory exclusions from income apply in these instant cases and we do not find any exclusions which do apply.

We conclude that each petitioner-husband received income within the broad sweep of section 61(a).[11]

Petitioners rely on *Ruben v. Commissioner,* 97 F.2d 926 (8th Cir. 1938), revg. 36 B.T.A. 604 (1937); *Parker v. Commissioner,* 365 F.2d 792 (8th Cir. 1966), revg. in part a Memorandum Opinion of this Court;[12] and *Ingalls v. Patterson,* 158 F. Supp. 627 (N.D. Ala. 1958), for the proposition "that the mere receipt of a benefit from payment of an expense by another does not in and of itself generate income to the recipient, and it is *only* when the benefit to the recipient is direct, rather than incidental, that adverse tax consequences result." (Emphasis in original.)

*Ruben* involved the tax aftermath of equity litigation in which the trial court had issued a decree against Ruben, two other individuals, and a corporation (Norhtwest) owned by Ruben and other individuals. The defendants in the equity case were held equally liable for damages of some $350,000 and were required to restore or cancel substantially all of the stock they had acquired in another corporation (Miles). See *Backus v. Finkelstein,* 23 F.2d 357, 367 (D. Minn. 1927). While an appeal was pending from that decree, the parties thereto agreed that Northwest should pay some $250,000 in full settlement of the claims against all the defendants, with Northwest being permitted to retain all the Miles stock. In *Sachs v. Commissioner, supra,* we analyzed the Court of Appeals opinion in *Ruben* as follows:

> The Court of Appeals for the Eighth Circuit in reversing our decision took the position that it had not been shown that Northwest was moved to make the compromise settlement to any extent because of its duty to indemnify the taxpayer and the other individuals; that the decree ran against the

---

[11]Often, we are not required to characterize the income. E.g., *Heyward v. Commissioner,* 36 T.C. 739, 746 (1961), affd. 301 F.2d 307 (4th Cir. 1962). In the instant case, the parties' agreement as to sec. 1348 (see note 3 *supra* ) leads us to conclude, a posteriori, that the income is compensation.

[12]T.C. Memo. 1965–77.

company which had at all times assets sufficient to respond and make satisfaction; that it compromised in its own interest; that the result as far as the taxpayer was concerned was that he merely escaped from a contested money claim; that the persons who were making the contested claims against the taxpayer ceased and desisted from making them and released him; that they were induced to do so by a payment made by a corporation which had its own interest to serve and which gained affirmative advantages through the settlement; and that the taxpayer was not enriched, but rather that he indirectly as a stockholder shared whatever loss to the company was included in the $250,000 payment. [32 T.C. at 822.]

In *Parker,* the Court of Appeals for the Eighth Circuit held the payment of Parker's legal expenses by an organization (of which Parker was both a director and founder) did not result in gross income taxable to Parker. The Court of Appeals opined that, if Parker had paid the legal expenses himself, then they probably would have been deductible by him as ordinary and necessary business expenses. Also, the Court of Appeals concuded that the organization stood to gain if Parker won the two lawsuits there involved, and that the organization would have collapsed if Parker lost the first of these lawsuits. 365 F.2d at 801. In *Ingalls,* the taxpayer had brought a shareholder's derivative action against the corporation and incurred attorneys' fees. Ultimately, the taxpayer, *qua shareholder,* prevailed and became chairman of the corporation's board of directors and chief executive officer of the corporation. The executive committee of the corporation then voted to reimburse the taxpayer for the legal fees he had paid in this derivative action. The *Ingalls* opinion points to the authoritative State law (Alabama), as enunciated by the highest court of that State, as decreeing that in such a situation it is the obligation of the corporation to pay the complainant's attorney's fees, since the complainant had incurred the fees in doing for the corporation what the corporation should have done on its own.

In the instant cases, in the second action the California court specified, in the modified judgment, which obligations were several (the civil penalties imposed on the individuals) and which were joint and several (the obligation of Corporation, Products, and Bailey to offer to make restitution to distributors; the $1 million civil penalty imposed on Corporation and Products; and the obligation of the Bestline Companies and 13 individual defendants to pay California its costs).

Under California law, each petitioner-husband was liable personally for the payment of his $50,000 civil penalty and no other defendant (individual or corporate) could be held liable for the payment of that petitioner-husband's civil penalty. *Garcia v. Superior Court in and for San Bernardino County*, 45 Cal. App. 2d 31, 113 P.2d 470 (4th Dist. Ct. App. 1941).[13]

Thus, in the instant cases, petitioner-husbands were not merely indirect beneficiaries. When Products paid the $50,000 civil penalties, it was paying liabilities that had been carefully imposed on petitioner-husbands and not imposed on Products or Corporation. In this respect, the instant cases are not like *Ruben*, where the obligation paid by the corporation was no more than what had been imposed by the trial court directly on the corporation.

Unlike the situation in *Parker*, there has been no showing in the instant cases that Products paid petitioner-husbands' $50,000 civil penalties in order to stave off Products' collapse. The civil penalties in the instant cases are significantly different from the attorney fees dealt with in *Parker*. Since respondent has not sought, in the instant cases, to include Products' payments of attorney fees in petitioners' income, we need not determine whether the Court of Appeals' rationale in *Parker* should apply to the attorney fees in the instant cases. Further, the analysis used by the Court of Appeals in *Parker*— i.e., even if the payments constituted realization of income, the taxpayer could have taken a deduction, thus making it a wash—is not applicable here since we hold, *infra,* that deduction of these payments is barred by section 162(f). Cf. *Commissioner v. Greenspun*, 670 F.2d 123 (9th Cr. 1982), affg. 72 T.C. 932 (1979). Finally, unlike the situation in *Ingalls*, petitioner-husbands' civil penalties did not arise from their attempts to get the Bestline Companies to do what these corporations should have done on their own. On the contrary, petitioner-husbands' civil penalties arose from their *individual, knowing* violations of California law and the California court's injunction in the first action.

Petitioners also cite *Ingalls, Ruben,* and *Parker* for the proposition that "when an employer makes a payment in

---

[13]Several liability should be contrasted with joint or joint and several liability. Cal. Civ. Code secs. 1430, 1432 (West 1964).

order to satisfy and extinguish its own legal obligation the payment by the employer does not result in taxable income to the Petitioners, even though they also derive an incidental benefit from such payment." Surely, such a rule of law would eliminate much of the income tax, since it applies literally to virtually all payments of compensation, dividends, interest, rent, royalties, and the items catalogued in section 61(a). The Internal Revenue Code does not—neither in terms nor in necessary implication—direct such a result.

As we have noted *supra,* certain payments by an employer for expenses which incidentally benefit the employee which would constitute gross income have been specifically excluded from the concept of gross income by Congress in explicit statutory provisions (e.g., meals and lodging for the convenience of the employer, section 119). No such exclusions apply to the instant cases.

We decline to ratify petitioners' proffered judicial rule, and so we need not examine the California statutes which petitioners assert permitted or required Products to pay petitioner-husbands' civil penalties.[14]

Petitioners argue that the inclusion of the payment of their civil payment by Products in their gross incomes would frustrate California's public policy behind indemnification of corporate directors, officers, and employees. Petitioners point to California Civil Code section 2802[15] and California Corporations Code section 830(f)[16] as evidence of this asserted public

---

[14]In *Yelencsics v. Commissioner,* 74 T.C. 1513, 1529–1530 (1980), the taxpayers argued that, when their corporation paid off a note on which they and their corporation were jointly liable, they did not have constructive dividends because the corporation's payment benefited them only incidentally. We agreed that the corporation was discharging its own liability, but we concluded that, in order to determine the tax impact on the shareholders, we had to determine why the corporation had assumed that liability in the first place. In the instant cases, even if we were to assume that Products had successfully managed, under California law, to become liable for the civil penalties imposed on petitioner-husbands, then we would conclude that Products incurred the obligation to pay petitioner-husbands' civil penalties as compensation for their services as employees.

[15]Sec. 2802. Indemnification for employees' expenses and losses in discharging duties. An employer shall indemnify his employee for all that the employee necessarily expends or loses in direct consequence of the discharge of his duties as such, or of his obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying such directions, believed them to be unlawful.

[16]Cal. Corp. Code sec. 830(f) reads in part as follows:

"The board of directors may authorize a corporation to pay expenses incurred by, or to satisfy a judgment or fine rendered or levied against, a present or former director, officer or

policy. Petitioners contend that there is a public policy concern for allowing corporate directors, officers, and employees to perform their duties without fear of legal entanglement and, in the event they incur individual liabilities, to put them in the same position they would have been had they not incurred the liabilities.

Firstly, the so-called public policy doctrine[17] has been raised in many contexts, but almost always as a sword by respondent in an effort to attack the deduction of otherwise allowable expenses. See *Commissioner v. Tellier*, 383 U.S. 687 (1966). Petitioners here raise the doctrine as a shield, to defend themselves from a requirement that they include an item in income. Petitioners have not called our attention to any case in which this doctrine has been applied to exclude income otherwise includable, and we have found none.[18] We see no basis in the statutes or in the case law for excluding the income here in dispute because of the public policy doctrine. The taxation of this income no more frustrates the public policy or interests of California than does the taxation of the

---

employee of the corporation in an action brought by a third party against such person (whether or not the corporation is joined as a party defendant) to impose a liability or penalty on such person for an act alleged to have been committed by such person while a director, officer or employee, or by the corporation, or by both; provided, the board of directors determines in good faith that such director, officer, or employee was acting in good faith within what he reasonably believed to be the scope of his employment or authority and for a purpose which he reasonably believed to be in the best interests of the corporation or its shareholders."

(After the year in issue, Cal. Corp. Code sec. 830 was repealed and replaced by Cal. Corp. Code sec. 317 (added by Stats. 1975, ch. 682, p. ___, sec. 7, effective Jan. 18, 1977. Amended by Stats. 1976, ch. 641, p. ___, sec. 11, effective Jan. 1, 1977).)

[17]In *Tank Truck Rentals v. Commissioner*, 356 U.S. 30, 33–34 (1958), the Supreme Court noted "that deductibility under §23(a)(1)(A) [of the Internal Revenue Code of 1939, predecessor of sec. 162(a)] is limited to expenses that are both ordinary and necessary to carrying on the taxpayer's business. *Deputy v. du Pont*, 308 U.S. 488, 497 (1940). A finding of 'necessity' cannot be made, however, if allowance of the deduction would frustrate sharply defined national or state policies proscribing particular types of conduct, evidenced by some governmental declaration thereof. *Commissioner v. Heininger*, 320 U.S. 467, 473 (1943); see *Lilly v. Commissioner*, 343 U.S. 90, 97 (1952)."

[18]In *Commissioner v. Wilcox*, 327 U.S. 404 (1946), the Supreme Court held that embezzled funds do not constitute income to the embezzler. The Supreme Court noted that imposing an income tax under such circumstances "would serve only to give the United States an unjustified preference as to part of the money which rightfully and completely belongs to" the person from whom the funds were embezzled. *Commissioner v. Wilcox, supra* at 410. See *James v. United States*, 366 U.S. 213, 227–230 (1961) (Black, J., dissenting). However, in *James*, the Supreme Court repented and overruled *Wilcox*. The 15 years of *Wilcox* might arguably be cited as an example of public policy exclusion from income, but that example is no longer good law.

salaries of California's officials and employees (e.g., *Sims v. Commissioner*, 72 T.C. 996 (1979)) or the taxation of those who win judgments in California's courts (e.g., *Roemer v. Commissioner*, 79 T.C. 398 (1982), on appeal (9th Cir., Nov. 15, 1982), even though such taxation diminishes the value of the compensation paid by the State, or the value of the judgments awarded in the State's courts.

Secondly, the California court that issued the amended judgment in the second action determined that each of petitioner-husbands was to be severally liable for the civil penalty imposed on that petitioner-husband. As discussed, *supra*, the imposition of several liability indicates that the California court intended the burden of each civil penalty to fall on the respective petitioner-husband. Products' payment of each petitioner-husband's civil penalty, if nontaxable, would remove the burden entirely, contrary to the California court's intent. Some part of the burden remains where the California court put it when petitioners are taxed on Products' payments of petitioner-husbands' civil penalties. If anything, then, the public policy of California, as embodied in the California court's modified judgment, is not frustrated but is enhanced by the taxation of the payments in dispute.

We conclude that the public policy doctrine does not require that the amounts of Products' payments of petitioner-husbands' civil penalties be excluded from petitioners' gross incomes.

We hold for respondent that Products' payments of petitioner-husbands' civil penalties result in gross income taxable to petitioners.

## II. Deductions

Petitioners argue that the payment of the civil penalties constitutes an ordinary and necessary business expense deductible under section 162(a).[19] Petitioners also argue that the

---

[19]SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

penalties do not fall within the ambit of section 162(f),[20] which disallows a deduction for an otherwise ordinary and necessary expense if the expense is a fine or similar penalty, because (1) the second California action was "purely and simply a civil proceeding," and (2) the penalty imposed under section 17536(a) of the California Business and Professions Code is not in lieu of criminal sanctions and does not in any way purport to proscribe criminal conduct.

Respondent maintains that the civil penalties imposed in the second California action are not deductible because (1) section 162(f) disallows deductions for the type of civil penalties involved in the instant cases, and (2) the civil penalties are not ordinary and necessary business expenses within the meaning of section 162(a).

We agree with respondent that section 162(f) bars the deduction of the civil penalties in the instant cases. We do not then decide whether these penalties are ordinary and necessary expenses.

Generally, ordinary and necessary business expenses are deductible under section 162(a). Section 162(f), however, limits section 162(a) by disallowing a deduction for "any fine or similar penalty paid to a government for the violation of any law" which otherwise would constitute an ordinary and necessary business expense.

The section 162(f) disallowance is not limited to criminal fines and penalties. "Congress, by use of the word 'similar,' was not intending to distinguish between criminal and civil sanctions, but rather was intending to make a distinction between different types of civil penalties." *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497, 652 (1980). Section 162(f) disallows a deduction for a civil penalty "imposed for purposes of enforcing the law and as punishment for the violation thereof" because the purpose of such a civil penalty is similar to a fine enacted under a criminal statute; the section does not preclude a deduction for the kind of civil penalty which is "imposed to encourage prompt compliance with a requirement of the law, or as a remedial measure to

---

[20]SEC. 162. TRADE OR BUSINESS EXPENSES.

(f) FINES AND PENALTIES.—No deduction shall be allowed under subsection (a) for any fine or similar penalty paid to a government for the violation of any law.

compensate another party for expenses incurred as a result of the violation." (*Southern Pacific Transportation Co. v. Commissioner, supra.*) Cf. *S & B Restaurant, Inc. v. Commissioner,* 73 T.C. 1226 (1980).

Petitioners cite the following passage from the Senate Committee on Finance report on the Revenue Act of 1971, Pub. L. 92–178, in support of their contention that "similar penalty" as used in section 162(f) encompasses only civil penalties which are "imposed in (1) a criminal or quasi-criminal proceeding or, (2) in a civil proceeding where the goverment has the 'fraud burden of proof' (i.e. proof by clear and convincing evidence) and where the imposition of the civil penalty serves the same purpose as a fine exacted under a criminal statute":

In approving the provisions dealing with fines and similar penalties in 1969, it was the intention of the committee to disallow deductions for payments of sanctions which are imposed under civil statutes but which in general terms serve the same purpose as a fine exacted under a criminal statute. The provision was intended to apply, for example, to penalties provided for under the Internal Revenue Code in the form of assessable penalties (subchapter B of chapter 68) as well as to additions to tax under the internal revenue laws (subchapter A of chapter 68) in those cases where the government has the fraud burden of proof (i.e., proof by clear and convincing evidence). It was also intended that this rule should apply to similar type payments under the laws of a State or other jurisdiction. [S. Rept. 92–437, at 73–74 (1971), 1972–1 C.B. 599, 600.]

Insofar as petitioners suggest that civil penalties imposed in criminal or quasi-criminal proceedings fall within the term "similar penalty" used in section 162(f), we agree. We further agree with petitioners that the proceedings in the second action were civil in nature and that the civil penalties in the instant cases were not imposed in criminal or quasi-criminal proceedings.

However, insofar as the petitioners suggest that for a civil penalty imposed in a civil proceeding to fall within the term "similar penalty," the proceeding must be one where the Government has the burden of proving the claim by clear and convincing evidence, we disagree.

We think that in coming to their conclusion about a required level of burden of proof, petitioners read the sentence in the quoted passage referring to additions to tax too broadly.

The purpose of the quoted passage was to clarify questions raised by the then-proposed regulations under section 162(f) as to whether the term "penalty" applied only to a criminal

penalty or also applied to a civil penalty. S. Rept. 92–437, *supra* at 73, 1972–1 C.B. at 600. The report then goes on to state that it was the intention of the committee in enacting section 162(f) in 1969 "to disallow deductions for payments of sanctions which are imposed under civil statutes but which in general terms serve the same purpose as a fine exacted under a criminal statute." S. Rept. 92–437, *supra* at 73, 1972–1 C.B. at 600. This, it seems to us, provides the touchstone for determining which civil penalties fall within section 162(f)— namely, those which serve the same purpose as a fine imposed under a criminal statute.

The sentence immediately following this stated rule, and the one petitioners seem to rely on, merely provides two examples of the types of sanctions imposed under a Federal civil statute, chapter 68 of the Internal Revenue Code of 1954, which are considered as serving the same purpose of a fine exacted under a criminal statute. The first are assessable penalties (under subchapter B of chapter 68). The second are additions to tax (under subchapter A of chapter 68) where the Government has the "fraud burden of proof (i.e., proof by clear and convincing evidence)." S. Rept. 92–437, *supra* at 73–74, 1972–1 C.B. at 600. In the General Explanation of the Revenue Act of 1971, 92d Cong., 1st Sess. 71 (Comm. Print 1972) prepared by the Staff of the Joint Committee on Internal Revenue Taxation, the phrase "assessable penalties (subchapter B of chapter 68)" is separated from the following phrase "as well as to additions to tax under the internal revenue laws (subchapter A of chapter 68)" by a comma. This punctuation further suggests that the "additions to tax" reference serves only the purpose of providing an example of "penalties provided for under the Internal Revenue Code" rather than defining "similar penalty" under section 162(f).[21]

We conclude that the phrase referring to additions to tax where the Government has the fraud burden of proof serves only the narrow purpose of including in the example of penalties under the Internal Revenue Code which fall within section 162(f), certain payments which are labeled "additions

---

[21]The report of the Staff of the Joint Committee on Taxation may properly be looked to in interpreting congressional intent. See, e.g., *United States v. Darusmont*, 449 U.S. 292, 300 (1981).

to tax" in the Internal Revenue Code of 1954. The civil fraud burden of proof is not a necessary element in order for a civil penalty under a State statute to be encompassed by the term "similar penalty" under section 162(f).

We conclude, and we have so held, that the Senate Committee on Finance report suggests that the appropriate method for determining which civil penalties are "similar penalties" under section 162(f) is to distinguish (1) civil penalties "imposed for purposes of enforcing the law and as punishment for the violation thereof," which are "similar" penalties, from (2) civil penalties "imposed to encourage prompt compliance with a requirement of the law, or as a remedial measure to compensate another party for expenses incurred as a result of the violation," which are not "similar" penalties. *Southern Pacific Transportation Co. v. Commissioner,* 75 T.C. at 652.

Whether section 162(f) disallows deduction of the civil penalties in the instant cases depends on whether they were imposed for purposes of punishing defendants. If the penalties were for purposes of either encouraging prompt compliance under California law or compensating another party, the section 162(f) disallowance would not apply. We must look to California law to determine the nature of the civil penalties in the instant cases.

In *People v. Pacific Land Research Co.,* 20 Cal. 3d 10, 569 P.2d 125 (1977), the Supreme Court of California held that civil penalties under section 17536 of the California Business and Professions Code, the section under which the civil penalties were imposed on petitioner-husbands, are designed to penalize defendants for past illegal conduct and not to compensate injured persons. 569 P.2d at 129. This authoritative interpretation (*Commissioner v. Estate of Bosch,* 387 U.S. 456, 465 (1967)) of the law under which the penalties were imposed convinces us that the penalties are "similar" to fines, within the meaning of section 162(f) and accordingly deduction of the civil penalty payment is barred by section 162(f).

We hold for respondent on this issue.

To take account of the settlement of other issues by the parties,

*Decisions will be entered under Rule 155.*