# United States Tax Court

T.C. Memo. 2023-47

EDWIN L. GAGE AND ELAINE R. GAGE,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket No. 23874-17.                          Filed April 12, 2023.

_____

*Pamela K. Wheeler* and *Jeffery D. Trevillion, Jr.*, for petitioners.

*G. Chad Barton*, *William F. Castor*, and *Vassiliki Economides Farrior*, for respondent.


## MEMORANDUM OPINION

HOLMES, *Judge*: The United States, on behalf of the Department of Housing and Urban Development (HUD), filed a complaint against Edwin and Elaine Gage. The Gages tentatively settled in December 2012 and gave their lawyer a cashier's check for the agreed amount before the end of the year. The government sometimes works slowly, and the tentative settlement didn't become final until March 2013. Shortly after, the Gages' lawyer delivered the check.

When the Gages filed their return for 2012, they claimed a business-loss deduction for the amount of the settlement.

The questions in this case are:

**[\*2]**

- Is the $875,000 the Gages paid to settle with HUD deductible as an ordinary and necessary business expense under section 162[1] for the tax year 2012?

- If it isn't, do the Gages owe a penalty for claiming the deduction?

*Background*

I.    *Formation of RMG and the Regulatory Agreement with HUD*

In February 1995 Edwin Gage incorporated RM&G, Inc. as an Oklahoma corporation. In June 1995, he incorporated Heartland Care Group, Inc., and it became RMG's parent company. By the time of the events that led to this case, the Gages jointly owned 30% of both RMG and Heartland Care.

RMG paid $7.25 million for Heartland Health Care Center of Bethany (Center), a nursing home in Bethany, Oklahoma, and for the leases to nine other Oklahoma nursing homes. In July 1996, a wholly owned subsidiary of RMG named Heartland of Bethany was itself incorporated to help win a HUD-insured refinancing of the Center. After RMG incorporated Heartland of Bethany, RMG transferred the Center to it though RMG continued to manage the home itself.

In February 1997 Heartland of Bethany borrowed nearly $5 million from Harry Mortgage Co. Harry Mortgage secured the loan with a nonrecourse mortgage. HUD insured the mortgage, but wanted to protect itself and so required RMG to operate as an identity-of-interest management agent[2] for the management of the Center. HUD also got both RMG and Heartland of Bethany to sign regulatory

---

[1] We are compelled to cite some nontax law in this opinion. When we do so, we will give full citations. Our "section" references without full citations are to the Internal Revenue Code in effect for the year in issue, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] An identity-of-interest "is any relationship based on family ties or financial interests between or among two or more entities involved in a project-related transaction which reasonably gives rise to a presumption that the entities may not operate at arms-length." HUD, *Healthcare Mortgage Insurance Program Section 232 of the National Housing Act: A HUD Handbook* § I, Ch. 1.6, at 4 (2017), https://www.hud.gov/sites/documents/42321HSGH.PDF.

[*3] agreements with HUD. The Gages themselves did not sign, but the regulatory agreements designated them as owners.

These regulatory agreements are central to this case. HUD was potentially on the hook for the mortgage—a mortgage that the Gages and the other individual owners of the corporations involved definitely were not. HUD wants to ensure that the people responsible for the management of a nursing home don't take so much money out of the operation as to send the mortgage into foreclosure. The parties drafted the regulatory agreement between HUD and Heartland of Bethany to provide that Heartland of Bethany would not, without HUD's prior written approval, transfer or encumber the mortgaged property or transfer any of the Center's personal property. It could pay out any funds only if there was a cash surplus or if the cash went to pay for reasonable operating expenses and necessary repairs. The Agreement prohibited Heartland of Bethany from receiving or keeping any assets or income (except surplus cash) from the Center without HUD's prior written approval. The Agreement also made Heartland of Bethany's owners[3] personally responsible for retaining funds or otherwise violating the regulatory agreement.

The regulatory agreement between HUD and RMG is similar to the one that HUD had with Heartland of Bethany. It too provided that HUD had to consent to any sublease or change or transfer in the management, operation, or control of the Center. RMG also promised to keep its own books in reasonable condition for proper audit with the expectation that they would be "subject to examination and inspection at any reasonable time" by HUD. RMG also promised to keep "copies of all written contracts or other instruments which affected the mortgaged property, all or any of which may be subject to inspection and examination" by HUD.

II.    *District Court Litigation*

The deal worked as intended for a few years, but in 2003 Heartland of Bethany defaulted on the mortgage. That same year, Harry Mortgage assigned the mortgage on the Center to HUD. HUD foreclosed in 2004 and then sold the Center for just over $600,000. HUD's loss on the deal ended up being about $4 million.

---

[3] The Agreement defined "Owners" to include Heartland of Bethany and its successors, heirs and assigns.

**[\*4]**     Years passed.[4] The government wasn't going to let the loss go, and in 2010 it sued RMG's owners in federal district court. *See United States v. Rich*, No. 5:10-cv-990 (W.D. Okla. filed Sept. 13, 2010). It sought double damages, costs, and fees under the National Housing Act, 12 U.S.C. §§ 1701-1750, and the Housing and Community Development Act of 1987, § 421, Pub. L. No. 100-242, 101 Stat. 1815, 1913 (codified as amended at 12 U.S.C. § 1715z-4a), for the recovery of Center assets and income. The government's complaint alleged that the owners used the Center's assets and income in breach of the regulatory agreement terms. The complaint also included a claim under federal common law for unjust enrichment.

Negotiations ensued, and by August 2012 it looked like the case would settle. The Gages, RMG's other owners, and counsel for the United States tentatively agreed to settle for $1.75 million, of which the Gages would pay $875,000. The deal was expressly conditioned on final approval by the Department of Justice, but it must have looked pretty likely that the deal would work out—the magistrate judge who supervised the settlement talks entered an order in which he noted that a settlement conference was held and that the settlement was contingent upon acceptance and approval by the DOJ. The district court then entered an administrative closing order, which terminated the suit without prejudice.

On December 27, 2012, the Gages purchased a cashier's check in the amount of $875,000 and delivered it to their lawyer. Their lawyer emailed the Assistant U.S. Attorney who represented the government to inform him that the check would soon be delivered. The Assistant U.S. Attorney, however, explained that the United States did not have authority to receive the cashier's check before the settlement was finally approved. The Gages' lawyer held onto the check.

The DOJ reviewed the settlement agreement and finally signed it in March 2013. The settlement agreement recited that the United States alleged that the owners had used the Center's assets and income in violation of the regulatory agreements. It also recited that the owners

---

[4] HUD held off on starting litigation because it first wanted to run an audit. RMG's owners did not at first provide subpoenaed records. But when the owners received a draft audit report it prompted more back and forth on what documents might still exist. After HUD issued its final audit report, RMG's owners contended that they had more records, albeit in a storage unit. The HUD auditor then met with a representative from RMG in the storage locker to sift through disorganized boxes of documents. This all took a while.

**[\*5]** denied any wrongdoing. The settlement agreement expressly stated that the United States was not agreeing to or in any way representing how the settlement amount would affect the owners' tax bill. It instead stated that "[t]he Parties agree and acknowledge that the United States has not made a representation, and nothing in this Agreement constitutes a representation or agreement by the United States, concerning the characterization of the Settlement Amount or this Agreement for purposes of the Internal Revenue laws, Title 26 of the United States Code."

The Gages' attorney then finally delivered the cashier's check, dated December 27, 2012, to the United States on March 18, 2013.

III.    *Return and Audit*

On their 2012 income tax return the Gages claimed a business loss of more than $900,000 on Form 4797, Sales of Business Property, the sum of the $875,000 payment and their legal fees. The Gages included the payment as a 2012 loss because they delivered the check to their attorney before the end of that year. The Commissioner disagreed, and added a substantial-understatement penalty under section 6662.

The IRS sent the Gages a notice of deficiency. The Commissioner has, however, conceded that the Gages' legal fees are deductible. The Gages have also conceded a minor issue, and the case was distilled into a single question: Are the Gages entitled to deduct the $875,000 as a business loss for 2012?

The Gages lived in Oklahoma when they filed their petition.[5]

*Discussion*

The parties agreed to submit the case for decision under Rule 122. The Gages argue that they are entitled to deduct the $875,000 settlement payment under section 162, which allows the deduction of ordinary and necessary business expenses.

I.    *Deductibility of the Settlement*

The Commissioner has two arguments for why the settlement amount is not deductible for 2012. The first is one of timing—he says

---

[5] Appellate venue is therefore presumptively in the Tenth Circuit. *See* § 7482(b)(1)(A).

**[\*6]** that the Gages' check was not actually received by the government until 2013. His second is that, even if the Gages are right about the timing, they still can't win because the settlement was one for punitive damages. Punitive damages are nondeductible under section 162(f). The Commissioner argues that the case against the Gages featured a plea for double damages, and that this transforms the government's recovery into an award of punitive damages.

We'll start with the timing issue. The Gages are cash-method taxpayers. What this means is that they can take deductions only for expenses that they actually paid, not that they merely incurred, during a particular tax year. *See Saviano v. Commissioner*, 80 T.C. 955, 964 (1983) ("It is clear that a cash basis taxpayer cannot deduct an expense incurred unless it has been paid during the taxable year") (citing Treas. Reg. § 1.461-1(a)(1)), *aff'd*, 765 F.2d 643 (7th Cir. 1985); *see also* § 446(a); Treas. Reg. § 1.446-1(c)(1)(i) ("Expenditures [by cash-method taxpayers] are to be deducted for the taxable year in which actually made.") There's a rule for payments by check as well—tax law treats a payment by check as made when the check is delivered. *See Guy v. Commissioner*, 105 T.C.M. (CCH) 1626, 1628 (2013). If a check is dated in one year but cashed in the next year, the deduction will not be allowed absent proof of delivery in the year of the deduction. *See Reynolds v. Commissioner*, 79 T.C.M. (CCH) 1376, 1383 (2000), *aff'd*, 296 F.3d 607 (7th Cir. 2002).[6]

The Gages did not themselves deliver the check to the government at the end of 2012. They instead gave it to their lawyer to deliver to the government when the settlement was finally approved. (And one might, though the parties don't, question whether the Gages owed anything under the settlement at all before it was finally approved.) Their lawyer delivered the check to the United States only on March 18, 2013. A copy of the United States's payment record confirms that this is the date that the check was received. That check was not cashed by the United States (i.e., actually paid) until March 22, 2013—after the DOJ reviewed and approved the agreement. The record includes a copy of the check, dated December 27, 2012, and a copy of the United States's payment record, showing that the United States received the Gages' cashier's check on March 18, 2013, and cashed it on

---

[6] There is an important exception for people who wait till the end of the year to make their charitable contributions. Those count in the year that the mailbox slot slams shut. *See* Treas. Reg. § 1.170A-1(b).

**[\*7]** March 22, 2013. The payment record proves that the delivery was made in 2013, not in 2012.

That would seem to end the matter. But the Gages argue that under Oklahoma law a payment is made when there is a tender of payment. They purchased a cashier's check and delivered it to their attorney in the case who then offered to give it to the Assistant U.S. Attorney who worked the case. He said that he could not hold the check since the settlement agreement had not been approved. The Gages argue that under Oklahoma law, this uncontested sequence of events is a tender of payment.

We don't need to review Oklahoma law because what constitutes delivery of a check made in settlement of a federal lawsuit brought by the federal government is, we hold, a matter of federal, not state, law. There are a few reasons. The first is that the litigation here was between an agency of the federal government and a taxpayer. *See Trout v. Commissioner*, 131 T.C. 239, 251 (2008) (citing *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988)) (finding that litigation between the federal government agency and a taxpayer is a factor that weighs in favor of using federal common law). This may not be decisive, but it weighs in favor of using federal law. *Id.*

The second reason is that settlements are contracts, and this contract was entered into under federal law. It was between a federal government agency and the Gages, and it was brought under a federal statute to protect a federal financial interest by the DOJ under its own procedures for approval of settlements. The federal government settles cases all over this broad land, and caselaw tells us that this means there is a strong interest in nationwide uniformity and therefore a need to use federal common law to develop and maintain a uniform law of settlements. *See id.* at 251 (first citing *Boyle*, 487 U.S. at 504; and then citing *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726, 728 (1979)) ("[A] federal government agency as litigant, contracts entered into under federal law, and the need for nationwide uniformity in administration, all point us to the federal common law of contracts as our source of rules."). All of these factors point toward using federal law to decide when the Gages paid the settlement.[7]

---

[7] We do note some lack of clarity in Tenth Circuit caselaw about whether federal common law or state law generally governs the interpretation of a settlement agreement where the United States is a party. In *United States v. McCall*, 235 F.3d

**[\*8]**    Because we disallowed the deduction on timing alone, we do not need to decide whether the settlement was for punitive or compensatory damages.

II.    *Penalty*

All that remains is the question of whether the Gages owe an accuracy-related penalty under section 6662(a).

Section 6662(a) imposes a 20% penalty for underpayments due to "any substantial understatement of income tax." *See* § 6662(b)(2). Whether the Commissioner met his burden of production in this case is a simple math problem. An understatement of tax is "substantial" if it exceeds the greater of $5,000 or "10 percent of the tax required to be shown on the return." § 6662(d)(1)(A). The tax required to be shown on the return is about $180,000, and 10% of that is about $18,000. This means that the understatement is way more than 10%, and we find that the Gages did substantially understate their income tax liability for 2012.[8]

The Gages argue, however, that they claimed the deduction reasonably and in good faith, which is a defense to a section 6662(a) penalty. *See* § 6664(c)(1). The regulation tells us to look at all the relevant facts and circumstances. *See* Treas. Reg. § 1.6664-4(b)(1). One circumstance that indicates reasonable cause and good faith is an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer. *Id.* An important factor for us to look for is

---

1211, 1215 (10th Cir. 2000), that court held that state law governed the interpretation of an agreement that settled a federal claim. In an earlier case, however, the same court held that "[f]ederal common law governs the enforcement and interpretation of [Title VII claims] because the 'rights of the litigants and the operative legal policies derive from a federal source.'" *Snider v. Circle K Corp.*, 923 F.2d 1404, 1407 (10th Cir. 1991) (quoting *Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207, 1209 (5th Cir. 1981)), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071. This possible lack of clarity doesn't bother us too much here, because not only did the Gages' settlement settle a federal claim; it settled a federal claim of the federal government. This means that all the factors that courts have identified as directing the use of federal common law point in one direction.

[8] The Commissioner also bears the burden of proving that he complied with section 6751. *See Chai v. Commissioner*, 851 F.3d 190, 221 (2d Cir. 2017), *aff'g in part, rev'g in part* T.C. Memo 2015-42; *see also Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016). The parties stipulated that he did so.

[*9] the extent of the taxpayer's efforts to figure out his proper tax liability. *Higbee v. Commissioner*, 116 T.C. 438, 448–49 (2001).

We therefore must look at whether the Gages had reasonable cause and good faith on two distinct issues:

- claiming the deduction for 2012 instead of for 2013; and

- taking the position that the settlement payment was an ordinary and necessary business expense.

A.    *Timing*

The Gages paid for the cashier's check on December 27, 2012. They argue that the funds effectively left their control as soon as they bought it.

The record we have shows the Gages are competent, skilled business people able to organize and operate two different corporations, but that they are not learned in tax law. We do find it more likely than not that they delivered the check to their attorney with the intent of fulfilling the terms of the settlement agreement. From their perspective they were out the $875,000 when they bought the check and gave it to their lawyer. We think their reporting position on the timing issue was reasonable under the circumstances, and that they acted in good faith in thinking they'd made the payment in 2012.[9]

B.    *Ordinary and Necessary Business Expense*

That's not the end of the penalty analysis, because the Commissioner says they were wrong not only about the year they claimed the deduction but in thinking they had a right to claim it at all. To figure this out, we have to give a bit of background on the legal issue involved. Section 162(a) allows taxpayers to deduct all ordinary and necessary business expenses. There is an exception, however, in section 162(f) which states that "[n]o deduction shall be allowed under subsection (a) for any fine or *similar penalty* paid to a government for the violation of any law." (Emphasis added.) Treasury Regulation § 1.162-21(b)(1)(ii) and (iii) defines the phrase "fine or similar penalty" for the purposes of section 162(f) as including an amount paid as a civil

---

[9] In their briefs they also mentioned, albeit in passing, that their CPA saw that a check had been issued and reasonably assumed it had been delivered. Since this fact was not stipulated, we cannot consider it in our analysis.

[*10] penalty imposed by federal, state, or local law and an amount paid in settlement of the taxpayer's actual or potential liability for a fine or penalty (civil or criminal). Treasury Regulation § 1.162-21(b)(2), on the other hand, provides that "[c]ompensatory damages . . . paid to a government do not constitute a fine or penalty." The Commissioner argues that the settlement payment is a "fine or similar penalty" while the Gages argue it was "compensatory."

We have held that civil penalties "imposed for purposes of enforcing the law and as punishment for the violation thereof" are "similar" to penalties under section 162(f). *Huff v. Commissioner*, 80 T.C. 804, 824 (1983) (quoting *S. Pac. Trans. Co. v. Commissioner*, 75 T.C. 497, 652 (1980), *supplemented by* 82 T.C. 122 (1984)). On the other hand, we have held that some civil payments, although labeled "penalties", remain deductible if "imposed to encourage prompt compliance with a requirement of the law, or as a remedial measure to compensate another party." *Id.*; *see also Middle Atl. Distribs., Inc. v. Commissioner*, 72 T.C. 1136, 1143 (1979) (finding the purpose of a fine or similar penalty under section 162(f) to "punish and/or deter").

Our characterization of a payment under section 162(f) depends on the origin of the liability giving rise to it. *Waldman v. Commissioner*, 88 T.C. 1384, 1389 (1987) (first citing *Bailey v. Commissioner*, 756 F.2d 44, 47 (6th Cir. 1985); and then citing *Middle Atl. Distribs.*, 72 T.C. at 1144–45), *aff'd per order*, 850 F.2d 611 (9th Cir. 1988). If the origin of the liability is a law designed to compensate an injured party for its damages, then section 162(f) is likely inapplicable. *See, e.g., Mason & Dixon Lines, Inc. v. United States*, 708 F.2d 1043, 1047–48 (6th Cir. 1983) (liquidated damages for violating state truck-weight limits compensatory). If the origin of the liability is a law designed to punish or deter conduct committed by the taxpayer, then the payment is likely nondeductible under section 162(f). *See, e.g., True v. United States*, 894 F.2d 1197, 1205 (10th Cir. 1990) ("on balance" Federal Water Pollution Control Act damages are a penalty because they serve "a deterrent and retributive function similar to a criminal fine"); *Huff*, 80 T.C. at 824 (civil penalty punitive because statute designed to penalize).

The relevant law here is the National Housing Act, 12 U.S.C. §§ 1701–1750, and section 421 of the Housing and Community Development Act of 1987, 12 U.S.C. § 1715z-4a. It allows the United States to recover double damages, costs, and fees for breach of a regulatory agreement with HUD. The United States also sought in its

**[\*11]** complaint recovery under federal common-law theories of unjust enrichment, fraud, disgorgement of profits, recoupment, and restitution.

The caselaw is unclear about what purpose the recovery of double damages might serve. The Second Circuit has held that that "[t]he purpose underlying the equity[-]skimming statue[10]was to provide the government with a greater *deterrent* by affording it an additional remedy beyond the traditional remedies of foreclosure and suit for breach of contract." *Livecchi*, 771 F.3d at 352 (emphasis added) (quoting *United States v. Livecchi*, No. 03-CV-6451P, 2005 WL 2420350, at \*7 (W.D.N.Y. Sept. 30, 2005)). The First Circuit, however, limits recovery of double damages to only a subset of cases brought under the statute. In *United States v. Cofield*, 215 F.3d 164, 171 (1st Cir. 2000), it explained that "[d]ouble damages for the government on a deterrence rational make sense primarily where the defendant is guilty of substantial or repeated fault." A district court in that circuit acknowledged that the attorney general may, not must, recover double the value of the assets and income of the property, and whether to award double damages in any potential case is ultimately left to the discretion of the trial court. *See United States v. Giordano*, 898 F. Supp. 2d 440, 468 (D.R.I. 2012).

We conclude from this that the double-damages provision under which the government sued the Gages may serve both to compensate the government and to punish. We also conclude that is not clear from the text of the statute or the caselaw construing it which purpose was present in the Gage's settlement.

And the terms of the settlement itself don't help us much either. The agreement specified that the Gages in conjunction with other owners were responsible for paying the United States $1.75 million by certified check on the effective date of the agreement.[11] It promised to release the Gages from any civil or administrative monetary claim once they fully paid. But there ends any help it might give us in characterizing the settlement.

We have one last place to look. When a settlement agreement is silent on the character of the payment, we have looked for other evidence

---

[10] 12 U.S.C. § 1715z-4a has been described as an equity-skimming statute. *See United States v. Livecchi*, 711 F.3d 345, 352 (2d Cir. 2013).

[11] The settlement agreement was entered into between the United States and the owners of the Center. The agreement required the Gages and one other couple to collectively satisfy the $1.75 million settlement amount.

**[\*12]** of the parties' intent. *See Ziroli v. Commissioner*, T.C. Memo. 2022-75, at \*10. We have looked in other cases at documents sent between the parties that describe settlement negotiations, or relied on parties' testimony about their negotiations. But we have none of that here: This case was submitted under Rule 122. There is no documentation of the parties' negotiations included in the exhibits, and we don't even know if any exists.

We do have one bit of proof about that intent. As the Gages emphasize, the amount they paid in settlement of the claim was far less than the actual damages claimed, and much less than double those damages.

In *Hawronsky v. Commissioner*, 105 T.C. 94, 96 (1995), *aff'd without published opinion*, 98 F.3d 1338 (5th Cir. 1996), a taxpayer paid over $275,000 to the Department of Health and Human Services for an alleged violation of 42 U.S.C. § 254l(f)(1)(B)(iv). Of that amount, around $126,000 was trebled principal and around $145,000 was trebled interest. *Hawronsky*, 105 T.C. at 96. We held in *Hawronsky* that "the treble damages penalty . . . serves a deterrent and a retributive function similar to a criminal fine" because the damages "amount has no demonstrated relationship to the cost imposed on the Government of replacing petitioner's services." *Id.*

Here we think, in contrast, that there was such a "demonstrated relationship." Since HUD's loss was more than $4 million while the Gages with the other owners settled for only $1.75 million, we think it was reasonable for the Gages to have thought their payment more compensatory than punitive. This might not be enough if we had to figure out whether the Gages were entitled to deduct the settlement. But that's not the question we're asking here. We are asking only whether the Gages' claiming the deduction was reasonable. And here the proof— at least proof of the ambiguity of the situation—weighs strongly in their favor. When the text of the statute creating a cause of action is ambiguous, when the specific text of the parties' settlement specifically avoids giving us an answer, and when even the amount of the settlement could be read both ways, we can find it more likely than not that the Gages' return position was at least reasonable and taken in good faith.

We are not drawing a bright line that holds treble damages are always punitive and double damages never are. We couldn't. The Supreme Court explained in *United States v. Bornstein*, 423 U.S. 303, 316 (1976), a case under the False Claims Act, that "the Government's

**[\*13]** actual damages are to be doubled before any subtractions are made for compensatory payments previously received by the Government from any source. "This method of computation, which maximizes the deterrent impact of the double-damages provision and fixes the relative rights and liabilities of the respective parties with maximum precision, best comports in our view with the language and purpose of the Act." *Id.* at 316–17.

That kind of statutory precision isn't present here. The settlement amount here was only $1.75 million while HUD's loss was about $4 million. And here there was no mention in the settlement that actual damages were being "doubled before any subtractions [were] made." *Id.* at 316. That means that the facts here show that it is a close legal question, and we therefore find that the Gages were reasonable to report the settlement as they did, and that they also acted in good faith in doing so.

They win on the penalty.

*Decision will be entered under Rule 155.*